UNITED STATES of America, Plaintiff,

v.

Reva FITERMAN, Defendant.

No. 89 CR 176.

United States District Court,
N.D. Illinois, E.D.

June 26, 1989.

James I. Marcus, Williams & Marcus, Ltd, Chicago, Ill., for plaintiff.

Anton R. Valukas, U.S. Atty., Lawrence E. Rosenthal, Robert S. Rivkin, Asst. U.S. Attys., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

Defendant Reva Fiterman pleaded guilty to a two-count information charging her with conspiracy to distribute marijuana under 21 U.S.C. §§ 841(a)(1) and 846, and possession with intent to distribute an un-

specified quantity of marijuana under 21 U.S.C. § 841(a)(1). These offenses were committed after November 1, 1987. It is undisputed that Fiterman's sentence is governed by the Sentencing Reform Act of 1984 and the sentencing guidelines promulgated under that legislation.

Prior to the initial sentencing hearing, Fiterman moved for departure below the applicable guideline range to a probationary sentence on several theories. At the first hearing, the government orally moved for a downward departure based on Fiterman's cooperation. The court then requested that the government file an appropriate motion and submit supporting information, *in camera* if necessary, so that the requisite evaluation of Fiterman's assistance to authorities could be made under § 5K1.1 of the guidelines. Instead, the government's departure request was made by letter to the court; no information concerning Fiterman's offense behavior and cooperation was submitted, other than the government's two-page version of the offense previously incorporated in the presentence investigation report.

Due to this lack of information, the court requested that the probation officer obtain copies of the Drug Enforcement Administration (DEA) case report and the affidavit supporting a search warrant executed on Fiterman's home. These materials are part of the record and have been considered by the court after Fiterman had an opportunity to object to their accuracy and offer any explanations.

Following three sentencing hearings, the court concludes that a departure below the applicable sentencing guideline range is not warranted.

## THE DEFENDANT'S BACKGROUND

Fiterman is 56 and has no prior criminal history. She has three adult children: a 33 year old son who lives with her; a 27 year old disabled son who is a student at Southern Illinois University in Carbondale, pursuing a business and finance degree; and a 25 year old married daughter who is a homemaker and does not reside with Fiterman.

Fiterman's 27 year old son suffered a closed brain injury in a motorcycle accident approximately eight years ago. Fiterman cared for him through his convalascence and rehabilitation. He addressed the court at the initial sentencing hearing. At the present time, he suffers from a speech impairment and communicates by use of an alphabet board. He walked without assistance in the courtroom. According to the presentence report, he is able to write and has resumed his college studies away from home where he is not under his mother's daily care.

Fiterman attended college for two years. She has been married four times. She assisted in the management of her last husband's multimillion dollar scrap metal business in the early 1970's. She has not been employed for the past ten years, but has been a fund-raiser for the disabled for eight years. She claims to be destitute.

The drug activities that are the subject of this prosecution center on a 17–room home in Forest Park, Illinois, where Fiterman has lived for 27 years. Her property includes a 6,800 square foot house, a heated swimming pool, a cabana, a clubhouse, and an attached three-car garage.

## THE DEFENDANT'S OFFENSE BEHAVIOR

In late 1985, Fiterman agreed to store large shipments of marijuana smuggled from Mexico in her home. She now claims she made this arrangement with a man named Enrique Diosdada, who once worked for Fiterman caring for her disabled son. Fiterman gave Diosdada a key to her home and an electric door opener for the attached garage. In 1986, Fiterman warehoused four or five marijuana shipments in the garage area. She admits she was paid approximately $5,000 in cash on each occasion. Diosdada temporarily stopped storing marijuana at Fiterman's home in late 1986, when he accused one of her sons of stealing from a load. In 1987, she admits she warehoused two more shipments.

According to the affidavit supporting the search warrant executed on her home, Fi-

terman told a DEA informant that after marijuana loads [1] were delivered, "... various individuals would come to her house to pick up quantities." Ehrsam Affidavit at ¶ 3. In early November 1987, the same informant brought Fiterman into the DEA office in Hammond, Indiana. She expressed an interest in becoming a paid informant. Fiterman told law enforcement officers she could introduce an undercover agent to someone who could supply large amounts of cocaine. *Id.* at ¶ 4.[2] When Fiterman was told the amount of money DEA was able to pay her as an *informant,* Fiterman "... stated that this compensation was inadequate and she declined to provide further information to DEA." *Id.*

Only a few weeks later, the informant reported to police that Fiterman told him she expected a large shipment of marijuana. After the informant saw and smelled the marijuana in her home,[3] DEA executed a search warrant. When DEA agents presented the search warrant to Fiterman, she denied there were any drugs in her home. Nevertheless, the agents found 604 pounds (net) of marijuana in 15 steamer trunks and seven large garbage bags in her master bedroom walk-in closet. A triple beam scale was found with the marijuana. Fiterman's purse, also found in the master bedroom, contained $1,150 in cash.

After the search was completed, Fiterman stated that she was not yet ready to tell DEA agents the name of the broker. She gave them some hints: an area resident within her telephone calling area who helped her financially for several years and who brokers bulk marijuana for "several upper class business persons." DEA December 3, 1987 report at ¶ 6. She agreed to meet DEA agents the following day to give a complete statement about the marijuana organization and her involvement.

The next day, however, she refused to cooperate and claimed she was in fear for her own safety and that of her family.

Not until almost one year later did Fiterman give the government any further information. By that time she faced indictment and the government had filed for civil forfeiture of her home based on its use to facilitate distribution of drugs. 21 U.S.C. § 881(a)(7). She then named Diosdada, a Vic Resa and his cousins as the persons responsible for the marijuana shipments distributed from her home. In the six months since she provided this information, DEA has been unable to locate Diosdada or any other coconspirator.

According to the government's brief submission to the probation officer, Fiterman's cooperation consists solely of furnishing the foregoing information, and agreeing to plead guilty, forfeit her house and testify for the government at any trial of her conconspirators.

## THE CHARGE BARGAIN

■ Although not disclosed in the written plea agreement filed at arraignment, it appears from the record that a form of charge bargaining occurred in this case. The amounts of marijuana warehoused in Fiterman's home in four to six shipments during the two-year conspiracy period are not set forth in the conspiracy count, nor is the 604 pounds seized from Fiterman's home on November 30, 1987 disclosed in the possession count. Under federal drug laws and the sentencing guidelines, drug quantity constitutes a critical factor that dramatically affects a sentence. Upon inquiry by the court at arraignment, the Assistant United States Attorney acknowledged that the amount of marijuana seized was omitted from the information "as a

---

1. The informant related that Fiterman told him she also stored cocaine. Fiterman disputes only the cocaine portion of the admission, which the court shall not consider.

2. Fiterman now explains through her attorney that she was referring to a friend in Florida who used cocaine that Fiterman just assumed was supplied by a big dealer.

3. Fiterman now denies that she showed marijuana to the informant. However, the informant's pre-search description of where he saw the marijuana—in a walk-in bedroom closet—is corroborated by the uncontested fact that DEA agents found marijuana stored in Fiterman's master bedroom walk-in closet. The court therefore does not find Fiterman's denial credible.

matter of prosecutorial discretion" to avoid a mandatory minimum five-year sentence on the possession count. No reasons for failing to charge the real offense conduct were given. The court therefore assumes that this unusual prosecutorial decision was the product of plea bargaining negotiations.

The legislative history of the Sentencing Reform Act reflects the serious concern of many judges, scholars and practitioners that plea bargaining practices may undermine the objectives of a fair, open and equitable sentencing system. Unwarranted sentencing disparity may be perpetuated by the manner in which prosecutorial discretion is exercised. Congress expressly expects judges

> ... to examine plea agreements to make certain that prosecutors have not used plea bargaining to undermine the sentencing guidelines.

S.Rep. 98–225, 98th Cong. 1st Sess. 63, 167 (1983). Congested trial calendars provide a natural disincentive for judges to scrutinize plea bargains and possibly upset guilty pleas. Nevertheless, the integrity of the system requires meaningful participation by judges in the sentencing process. *See* Alschuler, *Departures and Plea Agreements Under the Sentencing Guidelines,* 117 F.R.D. 459, 475 (1987) ("Certainty in sentencing cannot be achieved when prosecutors have broad discretion [to substitute charges] in plea bargaining"; the responsibility for control of charge bargaining is on the sentencing judge).

The Sentencing Commission, in response to congressional directive,[4] advises judges not to accept charge bargains unless it is determined,

> for reasons stated on the record, that the remaining charges adequately reflect the seriousness of the actual offense behavior and that accepting the agreement will not undermine the statutory purposes of sentencing.

§ 6B1.2(a).

A court cannot fulfill its responsibilities under a sentencing guideline system unless charge bargains are fully and candidly disclosed. No one will complain if the prosecutor (for tactical or subjective reasons) and the defendant (for preferential leniency) are both satisfied. The goals underlying the Sentencing Reform Act are undermined when charges fail to reflect the seriousness of actual offense conduct and the court and probation officer are unaware of the situation.

Here, there is now sufficient information in the record for the court to determine that the seriousness of Fiterman's actual offense behavior is adequately addressed by the guidelines applicable to possession with intent to distribute 604 pounds of marijuana. The statutory purposes of sentencing are not undermined by omission of the drug amount and the fact that Fiterman has avoided the mandatory minimum five-year sentence applicable to others who engage in similar conduct.

## THE APPLICABLE GUIDELINES

■ Except for the seizure of the last load, the court does not have any information concerning the volume of marijuana in the multiple shipments underlying the conspiracy count. This information is essential for determining relevant conduct under the guidelines. § 1B1.3. Drug quantities for multiple transactions are added to determine the appropriate offense level. § 2D1.1, commentary at ¶ 6. It is undisputed that Fiterman possessed 604 pound of marijuana on November 30, 1987. This quantity results in an offense level of 26 and a corresponding sentencing range of 63 to 78 months imprisonment for a defendant without a criminal record.

Crediting Fiterman's statements and the government's version that her role in the offense was relatively insignificant, the probation officer reduced her offense level by three levels. § 3B1.2. The offense level was then reduced two additional levels because Fiterman accepted responsibility for her criminal conduct. § 3E1.1. Fiterman and the government agree with the

---

**4.** 28 U.S.C. § 994(a)(2)(E).

probation officer's adjusted offense level of 21 and criminal history category of I.[5]

Giving Fiterman the benefit of the doubt concerning adjustments that result in an approximate 50% sentence reduction, the court adopts the probation officer's guideline calculations. The applicable guideline range is 37 to 46 months imprisonment.

## THE DEPARTURE MOTIONS

### I. Substantial Assistance to Authorities

■ Fiterman moves the court to depart from the applicable guideline range for a probationary sentence because she cooperated with the government. The government moves for a downward departure on the same grounds, but does not recommend any particular sentence.

Departures based on cooperation with the government are addressed in § 5K1.1.

*Substantial Assistance to Authorities*
Upon motion of the government stating that the defendant has made a good faith effort to provide substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.

The reasons for any reduction must be stated by the court. Factors that may be considered include:

(1) *the court's evaluation* of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3) the nature and extent of the defendant's assistance;

(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

(5) the timeliness of the defendant's assistance.

§ 5K1.1 (emphasis supplied). *See also* 18 U.S.C. § 3553(e) and 28 U.S.C. § 994(n) (the court is authorized to impose a sentence below a statutory minimum "... to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense"; such departures must conform with the guidelines and policy statements of the Sentencing Commission).

The government relies exclusively on its short official version of the offense submitted to the probation officer. That statement contains only the following reference to Fiterman's cooperation:

[On November 30, 1987, DEA agents] interviewed Fiterman and requested her cooperation. She admitted her own role in the affair but refused to assist DEA in apprehending her coconspirators, explaining that she was too afraid to do so. Subsequently, a civil forfeiture complaint was filed seeking forfeiture of her house, and a criminal investigation was also begun by the United States Attorney's Office. In the course of that investigation, Fiterman agreed to forfeit her house, cooperate with the government and testify at any resulting trials. Thus far DEA has been unable to locate Diosdada or any other coconspirator.

Government memo. at 2.

The government's submission is insufficient to establish that Fiterman made a good faith effort to provide substantial assistance in the investigation and prosecution of her coconspirators. The fact that Fiterman admitted her own involvement when caught in possession of a significant and valuable quantity of marijuana, and later agreed to plead guilty and not contest the civil forfeiture of her house, were taken into consideration in awarding her an approximate 20% sentence reduction for acceptance of responsibility. Moreover, factors pertaining to Fiterman's recognition of responsibility for her own conduct are irrelevant to a departure for cooperation. § 5K1.1, application notes at ¶ 2.

---

**5.** It should be noted that the government's version fails to disclose Fiterman's false statement to a DEA agent that no drugs were in her home just before the search. DEA December 3, 1987

report at ¶ 4. This conduct may be considered as obstruction of justice under § 3C1.1, with an attendant two-level enhancement.

The information Fiterman provided about her accomplices a year after the conspiracy ended clearly was not timely or useful. By then the information was stale and apparently could not be verified. There is nothing in the record to corroborate the truthfulness, completeness or reliability of Fiterman's information. Nor is there any factual basis to conclude that Fiterman put herself or her family at risk in any way by furnishing stale information.

Omitted from the government's submission was the fact that only three weeks before her home was searched, Fiterman talked to DEA about becoming a paid informant regarding a cocaine supplier. Ehrsam Affidavit at ¶ 4. When DEA did not offer her enough money, she refused to cooperate and continued her participation in a major marijuana trafficking scheme. Under these circumstances, the court finds Fiterman's failure to give DEA timely information particularly revealing.

Finally, colloquy at Fiterman's guilty plea and the government's submission left the court with the impression that 604 pounds of marijuana were seized from the garage area of Fiterman's home and that she did not have direct contact with the drugs. The DEA report, however, reflects that all this marijuana was found stored in Fiterman's bedroom closet. DEA December 3, 1987 report at ¶ 5. This uncontested, objective fact speaks eloquently of Fiterman's level of knowledge and involvement in a major marijuana distribution conspiracy and the insignificance of the assistance she provided authorities.

## II. Lesser Harm

■ Fiterman also moves for a departure under § 5K2.11 on the ground that her involvement in drug trafficking was a "lesser harm" than her financial problems. The government has not taken a position on this contention.

The Sentencing Commission policy statement Fiterman cites provides that a reduced sentence may be appropriate when a

defendant commits a crime to avoid a perceived greater harm *and*

... the circumstances significantly diminish society's interest in punishing the conduct.... Where the interest in punishment or deterrence is not reduced, a reduction in sentence is not warranted. § 5K2.11.

Fiterman knowingly and actively participated in a scheme to distribute hundreds of pounds of marijuana for almost two years. It is unknown how much marijuana Fiterman's coconspirators actually distributed in this community. Measured by the 604 pounds seized from the last shipment and Fiterman's statement that she received approximately $5,000 in cash for storing each of four or five other shipments, it reasonably may be inferred that she provided a safe-house for a major marijuana distribution network. To further aggravate the situation, it appears that both of Fiterman's sons lived with her during the conspiracy. Indeed by Fiterman's own account, the warehousing arrangment was temporarily suspended when a coconspirator accused one of her sons of stealing marijuana from a load.

Fiterman not only facilitated distribution of large quantities of drugs, but she exposed her sons to drugs, drug dealing and drug dealers. Drug use and the involvement of young people in drugs are serious problems in this community. It is reasonable to infer that countless users, including many young people, purchased marijuana that had been warehoused in Fiterman's home. Given these considerations, the public interest in punishing Fiterman and generally deterring others who may be attracted to drug dealing as a means of easing financial stress precludes a sentencing reduction under a lesser harm theory.

## III. Age and Family Circumstances

■ Finally, Fiterman seeks a departure and probation based on her age and family circumstances, which she argues are factors not adequately considered by the Sentencing Commission.[6] *See* 18 U.S.C.

---

**6.** Fiterman has a penchant for exaggeration. She describes herself as elderly and penniless.

She refers to her 27 year old son as "a very sick child," "a quadriplegic" and "totally disabled."

§ 3553(b) (courts are to impose sentences within the guideline range unless an aggravating or mitigating factor exists that was not adequately considered by the Sentencing Commission). She cites *United States v. Rodriguez,* 691 F.Supp. 1252 (W.D.Mo. 1988) for the proposition that unusual family situations may be considered in departing from the guidelines. The government has not responded to these contentions.

By law, sex and socioeconomic status are not relevant in the determination of a sentence. 28 U.S.C. § 994(d); § 5H1.10. Age and family responsibilities were expressly considered by the Sentencing Commission and found not ordinarily relevant in determining whether a sentence should be outside the guidelines. *See* § 5H1.1 (age) and § 5H1.6 (family ties and responsibilities). *Rodriguez* merely reiterates the Sentencing Commission's policy statement: while family ties are not ordinarily relevant to a departure, they may be considered under extraordinary circumstances. *Rodriguez,* 691 F.Supp. at 1253.

Unfortunately, it is not uncommon for innocent family members, including children far younger and more dependent than Fiterman's, to suffer as a result of a parent's incarceration. Federal law mandates severe sentences in drug cases. As a result, families suffer financial, emotional and nurturing deprivations. It is a rare case where such hardships are not suffered. Neither Fiterman's age nor her family responsibilities present extraordinary circumstances that compel a departure.

The court may take Fiterman's age and family circumstances into consideration in selecting an appropriate sentence within the applicable guideline range. This is a serious case, involving a substantial amount of drugs over an extended period of time. Fiterman has avoided a mandatory five year sentence and received significant downward sentencing adjustments at the government's behest. Her offense behavior warrants a maximum sentence with-

in the guideline range. Because her son's needs may impose a burden on Fiterman's other two adult children in her absence, the court shall impose a sentence of 37 months, the minimum available within the guideline range.

## CONCLUSION

The motions of Fiterman and the government for a departure from the sentencing guidelines for cooperation are denied. Fiterman's motions to depart from the sentencing guidelines on the grounds that her conduct was a "lesser harm," and because of her age and family responsibilities, are denied.

---

Quadriplegia is defined as total paralysis from the neck down. *Webster's II New Riverside University Dictionary,* Houghton Mifflin Company (1984). Fiterman's son has use of his arms and legs and is not the helpless invalid she suggests. Given the serious nature of his accident and injuries, he has achieved an impressive measure of self-sufficiency.