7 F.3d 236
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
Audley E. MCKELVEY, JR., Defendant-Appellee.
 No. 92-2310.
 United States Court of Appeals, Sixth Circuit.
 Sept. 1, 1993.
 
 On Appeal from the United States District Court for the W.D. Mich., No. 92-00005; Robert Holmes Bell, D.J.
 W.D.Mich.
 AFFIRMED.
 BEFORE: KEITH and JONES, Circuit Judges, and PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 In sentencing Defendant-Appellee Audley E. McKelvey, Jr., the district court departed downward from the applicable sentencing guideline range. Plaintiff-Appellant United States appeals that downward departure. We affirm.
 
 I.
 
 2
 McKelvey lived with his second wife, his ten year old step-grandson, and his twenty-seven year old step-daughter in Vermontville, Michigan. McKelvey and his wife owned and operated a grocery store known as "Harm & Gene's."
 
 
 3
 In October 1991, McKelvey went to Yate's Hardware Store in Charlotte, Michigan, to purchase parts to make a silencer. Unbeknownst to McKelvey, the clerk in the store was Deputy Michael Monroe of the Eaton County Sheriff's Department. McKelvey explained to Monroe that the parts were for a silencer he was going to manufacture. When Monroe expressed a feigned interest in owning a silencer, McKelvey told Monroe that he could stop by Harm & Gene's anytime if he wanted a silencer for himself. Following the conversation with McKelvey, Monroe contacted Special Agent Lisa Haidys of the Bureau of Alcohol, Tobacco and Firearms.
 
 
 4
 On October 29, 1991, Monroe and Haidys, acting in undercover capacities, went to McKelvey's store. McKelvey gave them the key to a shed behind the store and told them to back their car into the shed and put the gun in their trunk. Once inside the shed, Monroe and Haidys found a .22-caliber rifle with the end of the barrel threaded with a silencer. After securing the gun in the trunk, Monroe reentered the store and paid McKelvey $80.00 for the gun and silencer. McKelvey informed Monroe that the silencer would not make the gun completely quiet, but it would sound like a BB gun.
 
 
 5
 On December 4, 1991, Monroe returned to McKelvey's store wearing a body transmitter. Monroe requested that McKelvey build a silencer for a home-modified handgun made from an AR-7 rifle for him. McKelvey said he could make the silencer if Monroe supplied the parts from the hardware store.
 
 
 6
 Monroe returned to the store on December 9 and 10, 1991, to deliver the requested parts. On December 23, 1991, Monroe returned to Harm & Gene's to purchase the silencer built for him by McKelvey. McKelvey turned over the silencer to Monroe and stated that the charge would be approximately $25.00. McKelvey was then arrested.
 
 
 7
 On January 8, 1992, McKelvey was indicted by a federal grand jury on three counts. Count one charged McKelvey with knowingly receiving and possessing a muffler and silencer (for a .22-caliber rifle) which was not registered in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5845 (1988), 5861(d) (1988), 5871 (1988), and 18 U.S.C. § 2 (1988). Count two charged McKelvey with knowingly receiving and possessing a muffler and silencer for a home-modified handgun, in contravention of the same statutes. Count three charged him with knowingly making a muffler and silencer for a homemade gun, in violation of 26 U.S.C. §§ 5845, 5861(f) (1988), 5871, and Section 2. On June 24, 1992, McKelvey and the government entered a plea agreement which was accepted by the district court. McKelvey pled guilty to count one in exchange for the government: 1) dismissing the other counts of the indictment; 2) recommending a two-level reduction for acceptance of responsibility; and 3) recommending that McKelvey receive a sentence in the lower one-third of the applicable guideline range.
 
 
 8
 A presentence report, completed by the United States Probation Officer, was mailed to the parties on July 27, 1992. The probation officer calculated an offense level of sixteen and a criminal history level of I. This resulted in a sentencing range of twenty-one to twenty-seven months. The presentence report also stated:
 
 
 9
 As of the date of this dictation, there do not appear to be any mitigating or aggravating circumstances concerning the offense or the offender that would warrant departure from the guidelines. We have not as yet received the medical reports concerning Mr. McKelvey's health. Upon review, the Court may consider a downward departure under 5H1.4 if it determines the defendant suffers from an extraordinary physical impairment.
 
 
 10
 J.A. at 42-43 (emphasis added).
 
 
 11
 An addendum to the presentence report was completed on August 12, 1992. This addendum contained more specific information regarding McKelvey's health and physical condition. Most notably, the addendum stated:
 
 
 12
 Audley Earl McKelvey, Jr., is a 55-year-old white male who stands 6'2" and weighs 217 pounds. He reports numerous health problems. Following is a report from Mr. McKelvey's physician, Burnett W. Zink, D.O.: Mr. McKelvey suffers from peripheral vascular insufficiency and hypertension. Recently, he had to be hospitalized at Lansing General Hospital for a transient ischemic attack. His blood pressure is a risk factor which contributes to this type of symptom occurrence. Stress will put Mr. McKelvey at risk for hypertension and further transient ischemic attacks which could lead to a full stroke which could leave him disabled. It is important that Mr. McKelvey remain as stress free as possible to lessen the chance of this occurrence.
 
 
 13
 ....
 
 
 14
 [McKelvey] claims that between June 15 and 18, 1992, he was an inpatient at Lansing General Hospital, having suffered a mini-stroke. He believes that he may have both heart and prostate problems. He will contact his physician to make an appointment for examination.
 
 
 15
 ... Currently, the defendant is being treated with 50 milligrams of Tenormin per day for high blood pressure. He takes aspirin on a daily basis and also takes quinine for leg cramps.
 
 
 16
 Id. at 47-48.[1] At a subsequent sentencing hearing, McKelvey disclosed that he has varicose veins which have previously required emergency treatment.
 
 
 17
 On August 21, 1992, the district court filed a notice of intent to depart downward under the United States Sentencing Commission's Guidelines Manual, § 5H1.1 (1991) [hereinafter U.S.S.G.]. J.A. at 15.
 
 
 18
 On August 28, 1992, the district court granted McKelvey a downward departure based on the nature of the crime and based on the totality of the circumstances including McKelvey's age (which was fifty-six at that time), physical condition and family responsibilities. McKelvey was sentenced to six months of home detention and three years of supervised release. In the district court's Judgment in a Criminal Case, it wrote that the sentence departs from the guideline range for the following reason(s):
 
 
 19
 The Court concluded that the base offense level did not adequately take into consideration the unique facts of this case. It is the Court's belief that the defendant, with a base level of 16, is not the same type of defendant envisioned by the sentence guideline commission for a person at this level. The Court further finds that the defendant's health condition; his wife's health; his status as a primary care giver for a minor grandson; his financial responsibility to care for additional relatives were all taken together, factors which under Guideline 5H1.6 provide [just reason for departure] from the guideline range of imprisonment.
 
 
 20
 J.A. at 19.
 
 II.
 
 21
 The government contends that the district court erred in a number of ways when it departed downward in sentencing McKelvey. As a preliminary matter, the government argues that the district court erred by finding that it could depart downward based on the totality of the factors. The government argues that the guidelines must be applied on a factor-by-factor basis such that the sentencing court cannot take a "totality of the circumstances" approach when departing downwards. According to the government, "[e]ach factor considered by the sentencing court in its determination to depart downward must establish a basis for departure on its own merits. Disparate factors may not be considered to provide an overall justification for departure." Appellant's Br. at 10.
 
 
 22
 Guideline interpretation is a question of law which we review de novo. United States v. Beckner, 983 F.2d 1380, 1383 (6th Cir.1993).
 
 
 23
 Courts are split on whether to employ a totality of the circumstances approach to departures. The First Circuit has rejected the totality of the circumstances approach to departures, see United States v. Pozzy, 902 F.2d 133, 138 (1st Cir.), cert. denied, 498 U.S. 943 (1990); however, the Ninth Circuit has held that it is permissible to use that approach. See United States v. Cook, 938 F.2d 149, 153 (9th Cir.1991).
 
 
 24
 In rejecting the totality of the circumstances approach, the First Circuit stated:
 
 
 25
 Nor do we approve a "totality of the circumstances" approach to sentencing under the guidelines. The guidelines were written as specifically as possible considering the inherently complex and difficult subject with which they deal. They must be applied on a factor-by-factor basis.... To condone a "totality of the circumstances" approach would allow a judge ... to nullify the guidelines approach to sentencing.
 
 
 26
 Pozzy, 902 F.2d at 138.
 
 
 27
 Juxtaposed with the First Circuit is the Ninth Circuit, which stated:
 
 
 28
 The statute speaks in the singular of "mitigating circumstance," 18 U.S.C. 3553(b). There is no reason to be so literal-minded as to hold that a combination of factors cannot together constitute a "mitigating circumstance." Given the Sentencing Commission's acknowledgement of "the vast range of human conduct" not encompassed by the Guidelines, a unique combination of factors may constitute the "circumstance" that mitigates. This conclusion is, indeed, required by the Guidelines themselves. The Commission says, in its formal treatment of departures, that the departure is to occur when "a court finds an atypical case," one "where conduct significantly differs from the norm." U.S.S.G. Ch. 1, Pt. A, § 4(b). What the Commission has focused on is "the case" conduct. Neither case nor conduct can be reduced to a single factor. Case and conduct are a total pattern of behavior.
 
 
 29
 In making a decision in any particular case, good judgment will often require the evaluation of a complex set of factors. No single factor may be enough to point to the wise course of decision. But a wise person will not look on each particular factor abstractly and alone. Rather, it will be how the particular pieces fit together, converge, and influence each other that will lead to the correct decision.
 
 
 30
 Cook, 938 F.2d at 153. Accord United States v. Ramirez, 792 F.Supp. 922, 923 (E.D.N.Y.1992) (citing Cook ).
 
 
 31
 Subsequent to Cook, the Ninth Circuit narrowed its application of the totality of the circumstances approach by holding that the factors that go into the evaluation "must be those at least authorized, and certainly not expressly prohibited, by the Sentencing Guidelines." United States v. Anders, 956 F.2d 907, 914 (9th Cir.1992), cert. denied, 113 S.Ct. 1592 (1993); see also United States v. Berlier, 948 F.2d 1093, 1097 (9th Cir.1991).
 
 
 32
 The Third Circuit has also held that "a combination of typical factors does not present an unusual case" warranting a departure. United States v. Rosen, 896 F.2d 789, 792 (3d Cir.1990); cf. United States v. Goff, 907 F.2d 1441, 1447 (4th Cir.1990) (In a case that cites Rosen, the court stated "Viewing the factors cumulatively adds nothing significant to the calculus [in determining whether to depart downward]."). Therefore, the Third and Fourth Circuits seem to hold that, where the factors are neither atypical nor unique, the combination of those factors would not present an unusual case warranting a downward departure.
 
 
 33
 We have generally agreed with the Ninth Circuit's analysis in Cook (that it is permissible to use a totality of the circumstances approach) and in Anders (that the factors to consider are only those not proscribed by the Sentencing Commission). Compare United States v. Brewer, 899 F.2d 503, 511 (6th Cir.) (in a departure case, we instructed sentencing courts to take into consideration the full panoply of relevant sentencing facts; however, we also noted that "a sentencing court should not treat as unique or unusual factors, those circumstances that the guidelines have already taken into account or expressly deemed irrelevant"), cert. denied, 498 U.S. 844 (1990) and United States v. Rodriguez, 882 F.2d 1059, 1065-68 (6th Cir.1989) (in upholding a sentence based on a departure from the guideline range based on a few factors, we stated, "[w]hile one of the factors found in the present case standing alone might not support the court's sentence, seen as a whole [three factors], the sentence is permissible."), cert. denied, 493 U.S. 1084 (1990) with United States v. Barnes, 910 F.2d 1342, 1347 (6th Cir.1990) (Ryan, J., concurring) ("The departure authority granted to sentencing judges is the individualized justice component that enables judges to tailor the sentence to a particular defendant for a particular crime, taking into account the unique factors relevant to each. That is the art of just sentencing.").
 
 
 34
 We both adhere to our holding in Brewer and adopt the reasoning of the Ninth Circuit. Therefore, we hold that it is permissible to use a totality of the circumstances approach to departures, so long as the factors considered are not factors the guidelines have already taken into account or expressly deemed irrelevant.
 
 III.
 
 35
 The government also contends that the district court erred by departing downward based on the factors it listed, whether in combination or singly. We agree that one of the reasons stated by the district court was improper; however, we find that the remaining factors, when viewed in combination, support the district court's decision. Cf. Rodriguez, 882 F.2d at 1066-68 (although the district court relied on some inappropriate grounds for departing, the district court's departure was still upheld based on the other appropriate factors).
 
 
 36
 The standard to be employed in reviewing downward departures from the Sentencing Guidelines is the three-prong analysis originally set forth in United States v. Diaz-Villafane, 874 F.2d 43, 49 (1st Cir.), cert. denied, 493 U.S. 862 (1989), and adopted by the Sixth Circuit in United States v. Joan, 883 F.2d 491, 494 (6th Cir.1989). See also Brewer, 899 F.2d at 506 (using the standard in Diaz-Villafane in a downward departure case). The Diaz-Villafane analysis utilizes three distinct standards of review:
 
 
 37
 First, we assay the circumstances relied on by the district court in determining that the case is sufficiently "unusual" to warrant departure. That review is essentially plenary: whether or not circumstances are of a kind or degree that they may appropriately be relied upon to justify departure is, we think, a question of law.
 
 
 38
 Second, we determine whether the circumstances, if conceptually proper, actually exist in the particular case. That assessment involves factfinding and the trier's determinations may be set aside only for clear error.
 
 
 39
 Third, once we have assured ourselves that the sentencing court considered circumstances appropriate to the departure equation and that those factors enjoyed adequate record support, the direction and degree of departure must, on appeal, be measured by a standard of reasonableness. In this context, reasonableness is determined with due regard for "the factors to be considered in imposing a sentence," generally, and "the reasons for the imposition of the particular sentence, as stated by the district court...."
 
 
 40
 874 F.2d at 49 (citations omitted) (footnote omitted).
 
 A.
 
 41
 One of the reasons the district court decided that this case warrants a downward departure was that the base offense level given for the crime McKelvey pled guilty to was not applicable. Pursuant to U.S.S.G. § 2K2.1(a)(5), McKelvey's base offense level is eighteen. Finding that base offense level too high, the court stated:
 
 
 42
 This is but another of a multitude of illustrations of the inapplicability of guidelines to the real life where judges and persons within the criminal justice process find themselves. For reasons that absolutely escape me, 26 U.S.C. Section 5861(d), which is the portion of the United States Code which relates to that of a silencer, someone sitting in Washington in their infinite wisdom determined that 18 points should be the calculation for that particular offense.
 
 
 43
 Try as I might in preparation for this sentencing, I see no dialogue, nothing which indicates why such a severe number of points were added to possession of a silencer unless I conclude that someone else must have concluded that in the heartland of offenses, which is the magic word that the guidelines are supposed to go to, that most people that had silencers, most people before this Court using silencers were using them in very nefarious and very dangerous criminal activity jeopardizing the health and welfare of our country. If I make that conclusion, which I guess is the only conclusion I can come to, then in fact maybe 18 points is a proper calculation for a silencer. Someone in the underworld, in the Mafia, someone about to breach national security, someone about to do violent acts such as assassination of the president or something like this in possession of a silencer, certainly probably 18 points could be added.
 
 
 44
 Now, if that is the underlying rationale for that high a calculation for a silencer, then an individual out in the hinterlands of Michigan running a grocery store with no prior criminal record who from all testimony wanted to get rid of some neighborhood dogs does not fit within the, quote, "heartland of the offense," end of quote, that the guidelines people anticipated. And if that's the case, then the guidelines are inapplicable.
 
 
 45
 J.A. at 62-63.
 
 
 46
 Pursuant to Diaz-Villafane, we first analyze the circumstances relied on by the district court in determining whether the case is sufficiently "unusual" to warrant departure. Upon plenary review, we find that the district court's rationale for departing from the guideline range is acceptable.
 
 
 47
 The term "firearm," as set forth in 26 U.S.C. § 5845 (1988), is very narrowly defined to encompass only weapons such as machineguns, silencers, sawed-off shotguns and rifles and bombs. Congress required registration of these types of weapons because it believed that these weapons, by their very nature, were extremely dangerous and served virtually no purpose other than furtherance of illegal activity. See United States v. Greer, 588 F.2d 1151, 1155 (6th Cir.1978), cert. denied, 440 U.S. 983 (1979); United States v. Peterson, 475 F.2d 806, 811 (9th Cir.), cert. denied, 414 U.S. 846 (1973). Furthermore, one of the basic purposes of a companion provision, Section 5861(d), which makes it unlawful for any person to possess a firearm which is not registered to him/her in the National Firearms Registration and Transfer Record, is to reduce traffic in such instruments that have as their prime purpose human disfigurement and death. Cf. United States v. White, 368 F.Supp. 470, 474 (N.D.Ind.1973), aff'd, 498 F.2d 1404 (7th Cir.1974); see also H.R.Rep. No. 1577, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.C.C.A.N. 4410, 4411-15 (in passing the Gun Control Act of 1968, Pub.L. No. 90-618, 82 Stat. 1213 (1968) [hereinafter the Act] which deals with both Title 18 and Title 26 of the United States Code, Congress noted that the principal purpose of the Act "is to strengthen Federal controls over interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders" and that the need to strengthen the controls is based on the "[t]he increasing rate of crime and lawlessness and the growing use of firearms in violent crime"). The statute specifically exempts one type of usage from its scope. Section 5845 states, in part:
 
 
 48
 The term "firearm" shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design and other characteristics is primarily a collector's item and it not likely to be used as a weapon.
 
 
 49
 While the term firearm in Section 5845 is meant encompass all types of usage except collection, we find, based on the applicable legislative history and accompanying case law, that the chief concern of Congress was curbing the nefarious use of the specified weapons.
 
 
 50
 Given that the overriding concern with Section 5845 is an attempt to control the nefarious use of these deadly weapons, we find that the guidelines were developed to deal with that type of usage. In dealing with the heartland of offenses, the guidelines do a sound job of enforcing the general purpose of the statute by providing a base offense level of eighteen and increased levels or possible upward departures for certain types of weapons, see U.S.S.G. § 2K2.1(b)(3) ("If the offense involved a destructive device, increase by 2 levels."), and for certain type of actions, see U.S.S.G. § 2K2.1, comment. (n. 16) (application note listing several instances where upward departure may be warranted including when "the offense posed a substantial risk of death or bodily injury to multiple individuals"). However, because the guidelines are based on the general notion that the statute was enacted to curb nefarious usages, the guidelines do not adequately deal with such a circumstance as a person who is merely using a silencer to chase away some stray dogs. Therefore, we hold that the base offense level the guidelines give for this type of use is unusual and so high as to warrant departure.
 
 
 51
 Next, we need to determine whether the facts in McKelvey's case warrant the downward departure. As noted above, the district court found that the McKelvey merely wanted to get rid of some neighborhood dogs. If that were the sole relevant fact in this case, we would be constrained to hold that the district court's finding of fact is not clearly erroneous. However, as we stated in Brewer, "the district court in fairness in [downward departure] cases should not merely emphasize mitigating circumstances while failing to consider aggravating factors that may counterbalance mitigating circumstances." 899 F.2d at 510. Similarly, in this case, the district court should have considered any aggravating circumstances before determining whether the mitigating circumstances outweighed those circumstances. For example, we note that McKelvey sold the silencer to a complete stranger. That fact belies the notion that McKelvey was attempting to rid himself of some stray dogs and may indicate that McKelvey was willing to possess and/or sell the silencer regardless of the intended use. Furthermore, McKelvey, in selling the silencer, tried to entice the undercover agent by puffing that he had previously made silencers for the Ku Klux Klan. In Brewer, we remanded the case for further determinations; however, because the district court's other reasons for downward departing are affirmed, we do not remand this case.
 
 B.
 
 52
 The district court also found that the combination of McKelvey's health, age, and family responsibilities warranted a downward departure. Pursuant to the Diaz-Villafane test, and in conjunction with our totality of the circumstances approach, we must first determine whether the factors relied on by the district court are sufficiently unusual to warrant a departure. As a preliminary matter we outline the various guidelines which deal with each individual factor the court found relevant when it departed downward.
 
 
 53
 With regard to McKelvey's health, the court moved for the departure pursuant to U.S.S.G. § 5H1.4. Section 5H1.4 provides, in relevant part:
 
 
 54
 Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. However, an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.
 
 
 55
 Based on this guideline, a court can depart downward when there are extraordinary physical impairments.
 
 
 56
 With regard to McKelvey's family responsibilities, the court relied on U.S.S.G. § 5H1.6, which states:
 
 
 57
 Family ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range.
 
 
 58
 Courts are split on whether family responsibilities can be a reason to depart downward. At least one circuit has concluded that the guidelines preclude consideration of family responsibilities as a basis for a downward departure, see United States v. Brady, 895 F.2d 538, 543 (9th Cir.1990), while others hold that family responsibilities are a legally permissible reason to depart downward. See United States v. Thomas, 930 F.2d 526, 529-30 (7th Cir.), cert. denied, 112 S.Ct. 171 (1991); United States v. Shortt, 919 F.2d 1325, 1328 (8th Cir.1990); United States v. Deigert, 916 F.2d 916, 918-19 (4th Cir.1990).
 
 
 59
 We have suggested that a sentencing court may depart downward from the sentencing guidelines upon a specific showing of extremely unusual and burdensome family circumstances. See Brewer, 899 F.2d at 508-09. The reason for this standard is that "[a]lthough a short prison term may impose hardship, '[u]nfortunately, it is not uncommon for innocent young family members, including children ... to suffer as a result of a parent's incarceration.' " Id. at 508 (quoting United States v. Fiterman, 732 F.Supp. 878, 885 (N.D.Ill.1989)). Nonetheless, as a legal matter, we hold that family responsibilities may be a reason to depart downward.
 
 
 60
 With regard to McKelvey's age, U.S.S.G. § 5H1.1 provides:
 
 
 61
 Age (including youth) is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. Age may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration. Physical condition, which may be related to age, is addressed at § 5H1.4 (Physical Condition, Including Drug or Alcohol Dependence or Abuse).
 
 
 62
 Absent extraordinary circumstances, age is not a sufficiently compelling reason to depart downward from the sentencing guidelines. See, e.g., United States v. Guajardo, 950 F.2d 203, 208 (5th Cir.1991), cert. denied, 112 S.Ct. 1773 (1992); United States v. Carey, 895 F.2d 318, 324 (7th Cir.1990); United States v. Summers, 893 F.2d 63, 68-69 (4th Cir.1990).
 
 
 63
 Based on the foregoing, we note that, in exceptional cases, each of these provisions allow for departures. Therefore, in accordance with Brewer, we hold that the district court relied on acceptable grounds for departing. Furthermore, we hold that when the actual factors relied on by the district court are viewed collectively, the circumstances of this case are sufficiently unusual to warrant a departure. Specifically, we find that a defendant of advancing age who has several health maladies including ischemic attacks which may lead to strokes, hypertension, and varicose veins, and who has primary caretaking and financial responsibility for three other persons, including two ill persons and a minor, presents circumstances that are sufficiently unusual that a departure may be warranted.
 
 
 64
 Under the Diaz-Villafane test, we next inquire as to whether the circumstances permitting a downward departure exist in this case. As noted earlier, we review the factfinder's determinations for clear error. 874 F.2d at 49.
 
 
 65
 When viewed collectively, McKelvey's health, age, and family responsibilities are such that they portray a man with considerable problems and difficulties. McKelvey is burdened with the primary responsibility of caring for his wife, who has some health problems, a step-grandson whose natural parents have abandoned him, and an ill step-daughter who lives in the same home and is not able to work. Compounding McKelvey's family responsibilities are his own health problems and advancing age. McKelvey is a fifty-six year old man with numerous health ailments. Based on his doctor's report, McKelvey suffers from hypertension, and has suffered one transient ischemic attack which required hospitalization. In addition, the report stated that McKelvey suffered from peripheral vascular insufficiency and that further stress would put McKelvey at risk for hypertension and further transient ischemic attacks which could lead to a full stroke. McKelvey also stated to the probation officer that he had suffered a mild stroke. McKelvey's counsel, at the hearing, also noted that McKelvey suffered from varicose veins which have required emergency treatment before.
 
 
 66
 Given the standard of review we are to apply, we find that the district court's findings are not clearly erroneous.
 
 
 67
 In addition to having to determine whether the district court could legally and factually do what it did, we must determine whether the amount of departure was reasonable. Id. Essentially, the district court departed downward from a two year sentence of imprisonment to three years of probation including six months of home detention. We find that the sentence imposed is reasonable.
 
 IV.
 
 68
 For the foregoing reasons, we affirm the sentence imposed by the district court.
 
 
 
 [1]
 "Ischemia" is "localized tissue anemia due to obstruction of the inflow of arterial blood." Webster's Ninth New Collegiate Dictionary 640 (1986). "Ischemic" is the adjective form of ischemia