persuasive, either individually or collectively. Accordingly, the judgments of sentence are **AFFIRMED**.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0116P (6th Cir.)
File Name: 00a0116p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  *v.*

JAMES DUNLAP (98-3855)
and JAKHAN THOMAS
(98-3856),
  *Defendants-Appellants.*



Nos. 98-3855/3856

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 97-00128—Edmund A. Sargus, Jr., District Judge.

Argued: September 22, 1999

Decided and Filed: March 31, 2000

Before: KRUPANSKY and NORRIS, Circuit Judges;
GWIN,[*] District Judge.

---

[*] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

———————————

**COUNSEL**

**ARGUED:**  Terry K. Sherman, Columbus, Ohio, Frederick D. Benton, Jr., Columbus, Ohio, for Appellants.  David J. Bosley, ASSISTANT UNITED STATES ATTORNEY, Columbus, Ohio, for Appellee.  **ON BRIEF:**  Terry K. Sherman, Columbus, Ohio, Frederick D. Benton, Jr., Columbus, Ohio, for Appellants.  David J. Bosley, ASSISTANT UNITED STATES ATTORNEY, Columbus, Ohio, for Appellee.

———————————

**OPINION**

———————————

KRUPANSKY, Circuit Judge.    The defendants-appellants James E. Dunlap, also known as "Fatty" ("Dunlap"), and Jakhan Thomas, also known as "Ja-Con" ("Thomas"), have each contested his respective sentence imposed following his conviction entered upon his guilty plea to conspiring to possess and distribute cocaine base (or "crack").  Both defendants have assailed their sentencing enhancements for possession of a dangerous weapon in connection with that offense.  Dunlap has additionally challenged the district court's quantification of cocaine base attributable to him, whereas Thomas has disputed the sentencing bench's rejection of his application for a downward sentencing departure.

Beginning on approximately December 1, 1996, and continuing until July 30, 1997, agents of the Columbus Police Department ("CPD") and the Federal Bureau of Alcohol, Tobacco, and Firearms ("ATF") jointly investigated a major narcotics consortium which encompassed Dunlap and Thomas, together with at least three additional confederates.  On December 14 or 15, 1996, surveillance operatives videotaped Thomas' sale of a Glenfield .22 caliber (model no.

powerless to revisit, modify, amend, abrogate, supersede, set aside, vacate, avoid, nullify, rescind, overrule, or reverse any prior Sixth Circuit panel's published precedential ruling of law.  *Washington*, 127 F.3d at 516-17 & n.9; *Smith*, 73 F.3d at 1418.

In a bid to surmount that obstacle to appellate relief, Thomas has argued that, because the 100 to 1 sentencing ratio is purportedly unfair irrespective of its previously adjudicated constitutionality,  the district court abused its discretion by failing to award him a downward sentencing departure under 18 U.S.C. § 3553(b) and U.S.S.G. § 5K2.0 (Policy Statement) by reason thereof.  However, although a sentencing court's decision to depart from the Guidelines is reviewable for abuse of discretion, *Koon v. United States,* 518 U.S. 81, 96-100 (1996), its decision *not* to depart is insulated from appellate scrutiny, unless the sentencing judge legally erred by failing to comprehend the lawful extent of his or her power to depart. *United States v. Coleman*, 188 F.3d 354, 357 (6th Cir. 1999) (*en banc*); *United States v. Landers*, 39 F.3d 643, 649 (6th Cir. 1994).

In the case *sub judice*, the initial forum possessed *no lawful authority* to depart downwardly from Thomas' Guidelines-mandated sentencing range by reason of the 100 to 1 sentencing disparity at issue; thus no error of law infected its failure to do so. *See United States v. Watkins*, 179 F.3d 489, 504 (6th Cir. 1999) (remarking that "[t]his Court has held repeatedly that objections to the Sentencing Guidelines' disparate punishments for crimes involving crack cocaine and cocaine powder are meritless and *the disparity is insufficient grounds for downward departure from guideline sentences*.") (emphasis added) (*quoting United States v. Welch*, 97 F.3d 142, 154 (6th Cir. 1996) (citations omitted)); *United States v. Gaines*, 122 F.3d 324, 328-31 (6th Cir. 1997) (reversing a trial court's downward sentencing departure anchored in the 100 to 1 crack-to-power cocaine differential).

This  review  has  carefully  considered  each  argument advanced  by  the  defendants-appellants  but  finds  none

rather than "personal use," crack;[13] and further, that said crack was either the property of Dunlap, jointly possessed by Dunlap and Tyson, and/or foreseeably possessed by Tyson within the orbit of his cooperative criminal relationship with Dunlap. Accordingly, the trial court's imputation, against Dunlap, of the 44 grams of crack uncovered at 3114 Allegheny Avenue was untainted by reversible error.

Additionally, Thomas has contested the constitutionality of the Congressionally-mandated 100 to 1 statutory sentencing disparity between crack cocaine and powder cocaine, whereby a given quantity of cocaine base triggers a penalty equivalent to that of one hundred times that weight of cocaine powder. *See* 21 U.S.C. § 841(b)(1) (A) & (B); U.S.S.G. § 2D1.1(c) (Drug Quantity Table). However, in his brief, Thomas conceded that "this issue has been previously decided" by the Sixth Circuit. *See, e.g., United States v. Smith*, 73 F.3d 1414, 1417-18 (6th Cir. 1996) (overruling a constitutional attack against the subject statutory sentencing disparity by applying pertinent binding Sixth Circuit precedents); *United States v. Washington*, 127 F.3d 510, 516-18 & n.9 (6th Cir. 1997), *cert. denied*, 118 S. Ct. 2718 (1998). This panel is precluded from accommodating Thomas' invitation to reconsider the previously adjudicated constitutional issue which he has framed, because a subsequent panel of this circuit court is

---

[13]Standing alone, 44 grams of cocaine base would incite an offense level of 30. U.S.S.G. § 2D1.1(c)(5). (The maximum possible overall Guidelines offense level is 38, whereas the lowest is six). The seizure of a major volume of cocaine base at a fortified high-traffic "crack house" necessarily raises the reasonable inference that those illegal stimulants were possessed for distribution purposes. *See United States v. Harris*, 192 F.3d 580, 589 (6th Cir. 1999) (ruling that the government had proved at trial beyond a reasonable doubt, via circumstantial evidence, that the defendant had possessed a mere 5.9 grams of crack for distribution rather than personal consumption, because the defendant carried that cocaine base, packaged in twenty small individually wrapped units for convenient street dispensation, while armed, in an urban district reputed for narcotics activity). The sentencing court's discrediting of Tyson's assertion that he possessed those drugs for personal consumption is not subject to appellate re-evaluation. *United States v. Gessa*, 57 F.3d 493, 496 (6th Cir. 1995).

60) sawed-off rifle[1] to an unidentified confidential informant ("CI") for $50 at the CI's residence (986 Seymour Avenue, Columbus, Ohio).[2] During that exchange, Thomas weighed two grams of cocaine base on the CI's digital scale, although the CI did not then purchase any of that crack.

Thereafter, the CI and covert investigators regularly purchased crack cocaine directly from Thomas. On March 23, 1997, in response to the CI's pager signal and a follow-up telephone conference, Thomas personally delivered 6.2 grams of crack to the CI's residence, which he (Thomas) sold to an undercover agent. On June 19, 1997, also at the CI's domicile, a clandestine investigator posing as a customer solicited twelve grams of crack from Thomas. Using the CI's residential telephone, Thomas contacted one of his accomplices, Frank Woods, to obtain the telephone number of Bryan Williams, a supplier of narcotics to the syndicate. Following Thomas' telephone call to Williams, Thomas instructed the CI to drive him to 1418 Clifton Avenue, Columbus, Ohio, where Thomas purchased crack from an unidentified male. The CI then returned Thomas to his (the CI's) residence, where Thomas, using the CI's digital scale, determined the weight of his recently-acquired contraband at eleven grams. Because that quantity fell short of satisfying the undercover detective's order, Thomas added several rocks of crack which he took from a plastic bag inside his sock. Crime laboratory technicians later determined that the aggregate amount of cocaine base vended by Thomas on that occasion weighed 11.8 grams.

Approximately one month later, on July 15, 1997, again at the CI's residence, a law enforcement officer masquerading as a crack addict offered to purchase one ounce of the

---

[1]The rifle's stock had been re-fashioned to resemble a pistol's grip, and its serial number had been obliterated.

[2]Peace constables surreptitiously recorded numerous illegal transactions at that location, including those described herein, via a clandestine video and audio taping system.

controlled substance from Thomas. In response, Thomas dialed a beeper number, which subsequently prompted a return call from defendant Dunlap via a telephone registered to co-conspirator Dashawn Tyson at 3114 Allegheny Avenue, Apartment C, Columbus.[3] Following his conversation with Dunlap, Thomas instructed the CI to drive him and their prospective client (the covert detective) to "Chuck's Carry-Out," 3140 Allegheny Avenue, Columbus, which was located a short distance from Tyson's domicile. Thomas then initiated a call from a nearby public telephone booth; minutes later, Dunlap arrived at the scene. Thomas immediately exited the CI's automobile, entered Dunlap's vehicle, and momentarily returned to the CI's vehicle toting 24.8 grams of crack cocaine, which he negotiated to the incognito investigator for $1,080. Unbeknownst to Thomas and Dunlap, officers had previously registered the serial numbers of those Treasury bills.

Two days later, July 17, 1997, Columbus peace officers executed a search warrant at Tyson's residence, 3114 Allegheny Avenue, Apartment C. Inside that dwelling, the CPD raiders discovered Tyson and Williams, accompanied by two other individuals. Detectives surfaced United States currency totaling $2,700, including $800 of the recorded bank notes which the undercover buyer had used to purchase crack from Dunlap, through Thomas, two days previously, concealed within a safe inside an upstairs bedroom closet, together with 25.1 grams of crack. An additional $800 in cash was also discovered in the closet. An additional 18 grams of cocaine base was found in the kitchen near a loaded nine millimeter Highpoint handgun. The officers also located 0.9 grams of cocaine base on the living room floor.[4] A

---

[3]Tyson and Dunlap had each executed, as co-tenants, a rental agreement for that apartment.

[4]In total, law enforcement personnel seized 44 grams of cocaine base, coupled with 45.4 grams of marijuana, during the July 17, 1997 search of 3114 Allegheny Avenue. The marijuana is not material to the instant appeal.

*v. Owusu*, 199 F.3d 329, 347-48 (6th Cir. 2000); *United States v. Hill*, 79 F.2d 1477, 1485-86 (6th Cir. 1996); *United States v. Cochran*, 14 F.3d 1128, 1132 (6th Cir. 1994).

Next, Dunlap has faulted the district judge's attribution to him of the 44 grams of crack seized during the Allegheny Avenue raid. As stated previously, a convicted offender should be charged, at sentencing, with all unlawful acts committed within the scope of his offense of conviction ("relevant conduct"), including uncharged narcotics foreseeably possessed by his compatriot in furtherance of their coordinated distribution enterprise. U.S.S.G. § 1B1.3(a)(1)(A) & (B); *United States v. Davern*, 970 F.2d 1490, 1493-94 (6th Cir. 1992) (*en banc*); *see* U.S.S.G. § 1B1.3, comment. (n.2) (positing that a conspirator is accountable for narcotics possessed by his cohort if that possession was both in furtherance of, and reasonably foreseeable in connection with, jointly undertaken criminal activity); *United States v. Ledezma*, 26 F.3d 636, 646 (6th Cir. 1994). "The government bears the burden of proving the quantity of drugs chargeable to a defendant for sentencing purposes by a preponderance of the evidence. Like other factual findings, the sentencing court's drug quantity determination is reviewable only for clear error." *Gessa*, 57 F.3d at 496 (citations omitted).

Dunlap has claimed that he did not own the 44 grams of cocaine base discovered at Allegheny Avenue. In support, he reiterated his allegation that he lacked unlimited access to the apartment whereas numerous unrelated individuals frequented that locale for narcotics transfers and/or consumption; and he has touted Tyson's proclamation that he owned all of the implicated cocaine base for his personal use rather than conspiratorial distribution. However, the proof, recounted above, that Dunlap engaged in concerted cocaine trafficking with Tyson at and from the Allegheny Avenue address sufficiently evidenced, by a preponderance, that the significant quantity of crack in question was "distribution,"

cannot be gainsaid, the trial court's two-point weapons enhancement of Thomas' offense level was not clearly erroneous.

The district court similarly added the two-point weapons enhancement to Dunlap's offense level tabulation, finding that he actually or constructively possessed one, or both, of the two loaded handguns confiscated at the crack den by CPD operatives on July 17, 1997. Dunlap has contended that he did not own either of those pistols, that he lacked ready access to that address (3114 Allegheny Avenue, Apartment C) because Tyson solely resided there, and that he lacked actual knowledge of the existence of the subject pistols. However, the Dunlap had co-signed the lease for that apartment, where he frequently conducted narcotics trade. During the CPD raid, agents surfaced certain of Dunlap's possessions, including a retail receipt memorializing Dunlap's purchase of a telephonic pager, photographs of Dunlap, and mail addressed to Dunlap at that location. Additionally, on July 15, 1997, Dunlap had personally responded to Thomas' telephone page by placing a return call from the Allegheny Avenue residence, which culminated in Dunlap's sale, through Thomas, of 24.8 grams of crack to an incognito detective. Additionally, surveillance intelligence revealed that Dunlap had been present at the Allegheny Avenue apartment on July 16, 1997, the day preceding the warrant execution which would ultimately yield the two firearms.

Consequently, no clear error invalidated the district court's finding that Dunlap jointly occupied and/or controlled the Allegheny Avenue apartment as a co-tenant with his confederate Tyson. Dunlap exercised access, control, and/or dominion over those premises, which served as a "safe house" for the crack cartel's distribution activities. Furthermore, the presence therein of weapons owned by his roommate/accomplice Tyson which were connected to the conspiracy's narcotics business was reasonably foreseeable. Hence, the sentencing court properly imputed *constructive* possession of those firearms to Dunlap, even if he lacked actual knowledge. U.S.S.G. § 1B1.3(a)(1)(B); *United States*

loaded Browning .380 pistol, together with an ammunition magazine, was secreted within a living room couch, and a gun case containing two additional ammunition magazines was hidden behind that couch. The investigators also uncovered two electronic pagers plus a purchase receipt for a beeper sold to James Dunlap, along with correspondence and photographs belonging to Dunlap. A digital scale was found on the kitchen counter.

On October 14, 1997, a federal grand jury returned a nine-count indictment against Dunlap, Thomas, Woods, Williams, and Tyson. Count one alleged that, commencing around December 1, 1996 and continuing until October 14, 1997, the five defendants had conspired to possess with intent to distribute, and/or distribute, more than five grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B)(iii), and § 846. Count one further specified that the defendants conducted crack trafficking from, *inter alia*, 986 Seymour Avenue and 3114 Allegheny Avenue, Apartment C; and that Dunlap, Thomas, and Tyson used firearms in furtherance of the charged conspiracy. Additional counts alleged specific instances of crack distribution by Dunlap, Thomas, and/or other indicted participants in the ring.[5]

Ultimately, Dunlap and Thomas each pleaded guilty, under Fed. R. Crim. P. 11, to the first count, in exchange for dismissal of all other charges. The district court sentenced both defendants on July 16, 1998. During his sentencing proceeding, Thomas opposed the United States' requested two-level augmentation to his offense level for possession of a firearm, and also moved for a downward departure from his sentencing range mandated by the United States Sentencing

---

[5] Counts two, three, five, six, and seven averred that Thomas unlawfully possessed with intent to distribute, or distributed, cocaine base, on December 14, 1996, March 23, 1997, June 19, 1997, and July 15, 1997 (two counts), respectively. Counts six and eight alleged that Dunlap possessed cocaine base with intent to distribute on July 15, 1997 and July 17, 1997, respectively. Count four implicated only Frank Woods, and count nine concerned only Bryan Williams.

Guidelines (effective November 1, 1997) ("U.S.S.G."). The sentencing bench rejected both of Thomas' applications, and consequently condemned him to 108 months of correctional confinement,[6] to be followed by four years of supervised release, and exacted the $100 felony special assessment mandated by 18 U.S.C. § 3013(a)(2)(A). Likewise, at Dunlap's sentencing hearing, the trial judge, after overruling his objections to the government's proposed two-point firearms enhancement to his offense level, as well as attribution against him of the 44 grams of crack seized during the July 17, 1997 search of 3114 Allegheny Avenue, committed Dunlap to the United States Bureau of Prisons for 108 months,[7] to be followed by four years of supervised release, and fined him $1,000 plus the $100 mandatory assessment.

On review, Thomas and Dunlap have each challenged the district court's two-degree increase of his base offense level for possession of a "dangerous weapon," namely a firearm, during a controlled substance trafficking offense. U.S.S.G. § 2D1.1(b)(1). A sentencing court's determination that a convicted defendant possessed a dangerous weapon during the commission of a drug distribution offense constitutes a factual finding reviewed for clear error under the preponderance of the evidence standard.[8] 18 U.S.C.

---

[6] The initial court computed Thomas' sentence by matching his offense level (31) with his criminal history category (I), which produced an imprisonment range of 108 to 135 months. U.S.S.G. Chap. 5, Pt. A (Sentencing Table). Accordingly, Thomas incurred the least punitive detention term permissible under the Sentencing Guidelines.

[7] Like Thomas, Dunlap had merited an offense level of 31 and a criminal history categorization of I; thus, his 108 month penalty was the most lenient allowed by the Guidelines. *See* note 6 above.

[8] A finding of fact is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (citation omitted). A reviewing bench should sustain a sentencing court's factual finding if it was supported by "some

---

(expounding that "[t]he enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons."); *Gibson*, 135 F.3d at 1128 ("It seems apparent that the policy underlying the possession of a firearm enhancement is to punish those defendants engaging in drug transactions who present, by the possession of the firearm, an increase in the likelihood of violence at the time of the transaction."); *Duncan*, 918 F.2d at 651 ("the presence of firearms increases the level of danger and justifies a stiffer sentence."); *Castillo*, 979 F.2d at 10-11 (explaining that the defendant's mere possession of a weapon during narcotics commerce, including a firearm which the defendant intended to sell to his drug customer, triggered the section 2D1.1(b)(1) enhancement because the possibility existed that the defendant "would have used the gun during the drug transaction had he thought it necessary.") Beyond dispute, Thomas could have aggressively deployed his rifle, while in possession of "distribution" crack, at any moment prior to his transfer of that weapon to the CI.

Thus, even if Thomas had carried the modified rifle to the CI's residence with an intent to sell that weapon, the fact remains that he *also* carried that weapon "in connection with" a narcotics transgression. *See Gibson*, 135 F.3d at 1128; *Castillo*, 979 F.2d at 10-11. Patently, Thomas has not satisfied his burden of proving the "clear improbability" of any link between the gun and the drugs. He has proffered no evidence of "special circumstances" which might disqualify the subject armament from the classification of "criminal instrumentality" weapons, such as inoperability, status as a valuable collector's piece, or being a sporting long arm ill suited for criminal purposes. To the contrary, the weapon at issue was fully serviceable, was not an antique, and had been modified to facilitate its rapid deployment in a non-recreational confrontational context. Because the patent connection between the gun and Thomas' criminal career

---

similar offenses implicating most firearms of types not listed in section 5845(a)).

*Greer*, 588 F.2d 1151, 1155 (6th Cir. 1978).  *See*, *e.g.*, 26 U.S.C. § 5845(a), defining "firearm(s)" which are subject to certain special registration requirements and excise taxes to include, *inter alia*, "(3) a rifle having a barrel or barrels of less than 18 inches in length; [or] (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length[.]"  This circuit has explained:

> The term "firearm," as set forth in 26 U.S.C. § 5845 (1988), is very narrowly defined to encompass only weapons such as machineguns, silencers, *sawed-off* shotguns and *rifles*[,] and bombs.  Congress required registration of these types of weapons because it believed that these weapons, *by their very nature*, were extremely dangerous and *served virtually no purpose other than furtherance of illegal activity*."

*United States v. McKelvey*, 7 F.3d 236 (Table), 1993 WL 339704, at *6 (6th Cir. Sept. 1, 1993) (*per curiam*) (unpub'd) (emphases added; citations omitted).

The *McKelvey* court further remarked that, via the legislative history of the Gun Control Act of 1968,

> Congress noted that the principal purpose of the Act "is to strengthen Federal controls over interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders" and that the need to strengthen the controls is based on "the increasing rate of crime and lawlessness and the growing use of firearms in violent crime."

*Id*. at * 6 (brackets and parenthesis omitted) (*quoting* H.R. Rep. No. 1577, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N. 4410, 4411-15)).  Additionally, the *McKelvey* court underscored that Congress, via section 5845, exempted antique arms and almost any other device which "by reason of the date of its manufacture, value, design and other characteristics is primarily a collector's item and [is] not likely to be used as a weapon." *Id.* at * 6-7 (*quoting* 26 U.S.C. § 5845(a)).

*See also* U.S.S.G. § 2K2.1(a) (1), (3), (4)(B), & (5) (creating comparatively elevated base offense levels for persons convicted of crimes involving the receipt, possession, transportation, or other prohibited transaction in firearms described in 26 U.S.C. § 5845(a), thus reflecting the Sentencing Commission's judgment that prohibited transactions in such weapons should be punished more harshly than

§ 3742(e); *United States v. Hill*, 79 F.3d 1477, 1486 (6th Cir. 1996).

The United States Sentencing Commission's official Commentary[9] to section 2D1.1 posits, in part, that "[t]he adjustment should be applied *if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense*.  For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in his closet."  U.S.S.G. § 2D1.1, comment. (n.3) (emphases added).  Initially, the prosecution must prove, by a preponderance of evidence, that "(1) the defendant actually or constructively 'possessed' the weapon, and (2) such possession was during the commission of the [narcotics] offense." *Hill*, 79 F.3d at 1485 (citation omitted).  The burden then shifts to the defendant to prove the *clear improbability* of *any connection* between the drug offense and the weapon. *Id*.

The district court found that, in mid-December 1996, Thomas had possessed his modified .22 caliber rifle during the commission of a drug trafficking crime.  In opposition, Thomas has contended that the United States failed to prove

minimum indicium of reliability beyond mere allegation." *United States v. Robison*, 904 F.2d 365, 371 (6th Cir. 1990) (citations omitted).  *See also United States v. Partington*, 21 F.3d 714, 717 (6th Cir. 1994); U.S.S.G. § 6A1.3(a) (Policy Statement).  "The appellate courts generally do not review the district court's determinations regarding witness credibility." *United States v. Gessa*, 57 F.3d 493, 496 (6th Cir. 1995) (citation omitted).  However, although reviewing courts accord due deference to a lower court's application of the Sentencing Guidelines to the material facts, construction of the Guidelines is ultimately an issue of law subject to plenary review.  18 U.S.C. § 3742(e); *United States v. Sivils*, 960 F.2d 587, 596 (6th Cir. 1992).

[9]"The Sentencing Commission's Notes and Commentary to the guidelines is authoritative and binding upon the courts unless such are inconsistent with the Constitution, a federal statute, or the guidelines themselves." *United States v. Landers*, 39 F.3d 643, 646 n.7 (6th Cir. 1994) (*citing Stinson v. United States*, 508 U.S. 36, 38 (1993)).

that he possessed that weapon during a narcotics transgression; and, in any event, he purportedly had proved the "clear improbability" of any connection between that weapon and any drug crime which he had committed. He has emphasized that, when he vended his sawed-off long gun to the CI, he did not contemporaneously distribute any cocaine base.

However, as illustrated above, Thomas was a professional dope peddler who pleaded guilty to conspiratorial possession and distribution of cocaine base. During the firearm transaction in controversy, he physically possessed two grams of crack, which he weighed in the presence of the CI for the manifest purpose of (1) notifying the CI that those illegal stimulants were available for purchase, and/or (2) preparing them for street distribution. Hence, no clear error infected the sentencing court's rational inference, supported by a preponderance of evidence, that Thomas possessed the truncated rifle while in felonious possession of "distribution" crack, thus satisfying the prosecution's burden of proof.[10]

Moreover, Thomas has failed to discharge his rebuttal burden. His personal carriage of the altered rifle during his active commission of a drug trafficking offense raises the inescapable inference that he possessed the gun in connection with his concurrent narcotics infraction. *See, e.g., United States v. Gibson*, 135 F.3d 1124, 1128 (6th Cir.) (resolving

---

[10]Count two of the indictment had charged Thomas with possession of cocaine base with intent to distribute on or about December 14, 1996, the approximate date of the firearm transfer. As stated above, the district court dismissed that count, and others, pursuant to a Rule 11 plea agreement, under which Thomas pled guilty to the conspiracy charge (count one). However, criminal activities linked to the crime of conviction which are proved at sentencing by a preponderance of evidence should be punished as "relevant conduct," even if such misconduct had been uncharged, or charged in a count of dismissal or acquittal. U.S.S.G. § 1B1.3(a)(1)(A); *United States v. Lloyd*, 10 F.3d 1197, 1221 (6th Cir. 1993); *United States v. Kappes*, 936 F.2d 227, 229 (6th Cir. 1991); *United States v. Duncan*, 918 F.2d 647, 652 (6th Cir. 1990).

that an unloaded silencer-equipped .380 automatic pistol bartered by undercover agents to the defendant in exchange for cocaine base was possessed by the defendant in connection with the defendant's narcotics offense for section 2D1.1(b)(1) purposes), *cert. denied*, 118 S. Ct. 2310 (1998); *United States v. Castillo*, 979 F.2d 8, 9-11 (1st Cir. 1992) (sustaining a two-point § 2D1.1(b)(1) weapons enhancement ignited by the defendant's sale of a .22 caliber revolver, along with cocaine base, to an incognito ATF agent); *see generally United States v. Duncan*, 918 F.2d 647, 650-52 (6th Cir. 1990). *Accord, Fair v. United States*, 157 F.3d 427, 430-31 (6th Cir. 1998) (ruling, in an analogous context under 18 U.S.C. § 924(c),[11] that a person who personally transports a firearm to a drug deal has carried that weapon "in relation to" the underlying narcotics transaction, irrespective of any other purpose he may have allegedly had for carrying that instrument) (*citing, inter alia, Muscarello v. United States*, 524 U.S. 125, 131-38 (1998)).

The conclusion that Thomas' possession of the refashioned rifle was "connected" to a conspiratorial narcotics violation is bolstered by the trial court's explicit finding that "its stock [had been] sawed from the end to make it handle as if it were almost a pistol." The rifle's alterations rendered it a typical criminal instrumentality suitable for use as a cash-and-drugs protection tool and/or a street dealer's enforcement implement.[12] *See* U.S.S.G. § 2D1.1, comment. (n.3)

---

[11]Section 924(c) postulates, in pertinent part:

Whoever, *during and in relation to* any . . . drug trafficking crime . . . for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such . . . drug trafficking crime, be sentenced to imprisonment for five years[.]

18 U.S.C. § 924(c)(1). (Emphasis added).

[12]This appellate forum has recognized that Congress has specially categorized certain highly dangerous weapons, including sawed-off rifles, because of their manifest primary criminal purpose. *United States v.*