**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Bobby Lynn SHULTS (01–6534); Erwin Shane Stamper (01–6532); Jimmy Lynn Webb (01–6533), Defendants–Appellants.**

**Nos. 01–6532, 01–6533, 01–6534.**

United States Court of Appeals,
Sixth Circuit.

June 26, 2003.

Before MOORE and ROGERS, Circuit Judges; and HOOD,* District Judge.

## OPINION

MOORE, Circuit Judge.

Defendants–Appellants Erwin Shane Stamper ("Stamper"), Jimmy Lynn Webb ("Webb"), and Bobby Lynn Shults ("Shults") (collectively "Defendants") appeal their two-level sentence enhancements under United States Sentencing Guidelines ("U.S.S.G.") § 2D1.1(b)(1) for possession of a firearm in connection with a drug offense. The Defendants were indicted for, among other things, using and carrying a firearm in relation to a drug-trafficking offense in violation of 18 U.S.C. § 924(c)(1) and conspiracy to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846, and 841(b)(1)(B). Defendants pleaded guilty to that conspiracy count in the indictment, and all other charges were dismissed. The Defendants subsequently objected to the two-level enhancements in their presentence investigative reports ("PSR"), and the district court overruled these objections. The Defendants timely appealed. In addition, Shults filed two pro

* The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

se briefs challenging his conviction raising issues ranging from ineffective assistance of counsel to the involuntariness of his plea. We AFFIRM the two-level sentence enhancements as to all Defendants and Shults's conviction.

## I. BACKGROUND

On May 31, 2001, Webb and Shults received approximately two pounds of cocaine from Stamper that they arranged to sell to another individual. Unbeknownst to them,[1] the buyers were undercover agents. Webb and Shults drove in one car to the Hillcrest Inn motel in White Pine, Tennessee, where the transaction was scheduled to take place. While en route, Webb told Shults that Stamper was armed and was following them in his white pickup truck in order to protect his interest in the transaction.

Once they arrived at the motel, Shults entered a room to consummate the transaction, while Webb waited outside the motel room door and Stamper waited in his vehicle parked at least thirty-five yards, or 105 feet, away.[2] Stamper had backed his truck into a parking spot so that he was facing the doorway to the room. Within moments, the undercover agents arrested Webb outside of the motel. Stamper contends that from his vantage point, he could not tell that they were law enforcement because they were not wearing any clothing that identified them with the FBI.[3] Once the agents descended on Webb, Stamper attempted to drive away, but officers blocked his vehicle with their own to prevent his escape. During Webb's arrest. Stamper never tried to intercede and never displayed his pistol. After Webb was taken down, uniformed FBI agents arrested Stamper in his truck. The officers found a Beretta 9 mm semi-automatic pistol in the waistband of Stamper's swimming trunks. Although there was no cartridge in the chamber, the pistol had a fully loaded magazine and an additional magazine of ammunition was recovered from Stamper's truck.

The Defendants were indicted in a ten-count indictment charging them with conspiracy to possess with the intent to distribute and to distribute over 500 grams of cocaine and using and carrying a firearm in connection with drug trafficking. After unsuccessful attempts to suppress evidence and dismiss the indictment, the Defendants pleaded guilty to one count in the indictment, conspiracy to distribute more than 500 grams of cocaine. The plea agreements contained factual bases admitting to the conspiracy and to Stamper's gun possession. Nonetheless, the Defendants filed objections to their PSRs because they contained sentence enhancements based on the gun found on Stamper. In their objections, Webb and Shults contended that they did not know that Stamper had a gun on him at the time. Stamper argued that he had the gun and ammunition because he intended to shoot targets later that day.[4]

On November 5, 2001, the district court held an evidentiary hearing to consider evidence on the sentence enhancement.

---

1. In his challenge to his conviction, Shults claims that he knew that the buyers were undercover agents and believed that he also was acting in his capacity as an undercover informant.

2. Defendants rely on these figures to argue that Stamper could not possibly have intended to use his gun from this distance.

3. FBI Special Agent Thomas Farrow ("Farrow") testified that the agents either were wearing some identifying articles of clothing or displaying badges on their garments when they made the arrest.

4. Stamper attempts to lend credence to his story by continually noting that he is a gun enthusiast and that he was armed in all of his prior arrests.

The government catalogued its relevant evidence: (1) the magistrate judge's probable cause order determining that Stamper was acting as a lookout at the Hillcrest Inn motel; (2) Shults's signed statement that while driving to the Hillcrest Inn, Webb told him that Stamper had a gun to protect his interest in the cocaine; (3) the agreed factual bases in the Defendants' plea agreements;[5] (4) the magistrate judge's factual findings in his report and recommendation denying Stamper's motion to suppress evidence of the gun; and (5) the fact that Stamper had been in possession of firearms and marijuana on two previous occasions in the few months preceding his arrest.

At the hearing, Stamper called Farrow as a witness hoping to elicit testimony that cocaine dealers trafficking large amounts of drugs would not ordinarily have weapons involved in their drug transactions. In addition, Stamper planned to show through Farrow's testimony that the type of gun and ammunition and the lack of a cartridge in the chamber showed that he did not possess the weapon in furtherance of the drug crime. Indeed, Stamper was able to get Farrow to admit on the stand that had Stamper so desired he could have parked closer to the motel room. However, Farrow's answers also aided the government because he noted that the Beretta 9 mm is the standard issued sidearm for this nation's armed forces and he testified that the officers conducting the raid likely were dressed in attire emblazoned with law enforcement emblems.

The district court ultimately decided to overrule the objections and to accept the calculations contained in the PSRs. In its order, the district court noted Stamper's attempt to show that it was "clearly improbable" that the 9 mm pistol was carried in connection with the drug deal because:

> he always carried a gun; the gun was not particularly suitable for someone who was "riding shotgun" on the cocaine transaction; he did not use the gun or attempt to intervene when (arguably) unmarked officers moved in for the arrest; and, when he was arrested, there was no cartridge in the firing chamber of the (loaded) gun.

Joint Appendix ("J.A.") at 101 (Dist Ct. Or.). Nonetheless, the district court determined that "it was by no means clearly improbable that Mr. Stamper's presence at the motel was to provide armed protection for his co-conspirators' transaction." *Id.* With respect to Webb and Shults, the district court determined that because both men knew that an armed Stamper followed them and because both admitted to these facts in their agreed factual bases, "it was reasonably foreseeable to them that a weapon would be present at the transaction." *Id.* The district court sentenced Stamper and Webb to sixty-three months in prison and four years of supervised release and Shults to one hundred months in prison and four years of supervised

---

5. The factual bases were all substantially similar and stated:

> Erwin Shane Stamper, Jimmy Lynn Webb, and Bobby Lynn Shults conspired to possess and distribute over 500 grams of cocaine. On May 31, 2001, Webb, aided by Shults, obtained approximately two pounds of cocaine from Stamper in Cosby, Tennessee, which Webb and Shults then distributed to an undercover agent in Jefferson County, Tennessee. Stamper followed Webb and Shults to the transaction at a White Pine motel to monitor the transaction. At the time of the transaction, as Webb and Shults then knew, Stamper was carrying a Beretta 9 mm semi-automatic pistol. Approximately 906.7 grams of cocaine were distributed to the undercover agent.

Joint Appendix ("J.A.") at 84 (Webb's Factual Basis); *see also* J.A. at 76 (Stamper's Factual Basis); J.A. at 92 (Shults's Factual Basis).

release. The Defendants each timely appealed their sentences. Shults also appeals his conviction.

On appeal, Stamper's primary argument is that the weapon was not connected with the drug transaction taking place at the motel. Webb's main argument on appeal is that he should not have received the firearm enhancement because, not only was the gun not present in connection with the offense, but also it was improbable that Webb knew that Stamper possessed a gun. Shults contends that the government failed to show constructive possession because "[t]he mere fact that one co-defendant (Webb) informs another co-defendant (Shults) that yet another co-defendant (Stamper) is carrying a weapon does not rise to the level of adequate proof of constructive possession." Appellant Shults's Proof Br. at 9. In addition. Shults's pro se briefs raise a plethora of issues, which in essence amount to the following challenges to his conviction: (1) unknowing and involuntary plea based on mental defect, misrepresentation, and coercion; (2) entrapment based on Shults's contention that he did not further the objective of the conspiracy because he did not voluntarily participate in it but, rather, was coerced into serving as a confidential informant for both this drug transaction and previous other transactions; (3) Shults, with the mental capacity of a child of eleven or twelve years old, cannot be held to the same standard of "reasonable foreseeablity" as would a normal adult; (4) ineffective assistance of trial counsel; and (5) ineffective assistance of appellate counsel due to a conflict of interest.

## II. ANALYSIS

### A. Standard of Review

We review de novo a district court's legal conclusions regarding the application of the guidelines. *United States v. Miggins*, 302 F.3d 384, 390 (6th Cir.), *cert.*

*denied,* 537 U.S. 1097, 123 S.Ct. 712, 154 L.Ed.2d 648 (2002), *and* 537 U.S. 1130, 123 S.Ct. 909, 154 L.Ed.2d 817, *and* — U.S. ——, 123 S.Ct. 1772, 155 L.Ed.2d 531 (2003). We review for clear error a district court's factual finding that a defendant possessed a firearm during the commission of a drug-trafficking offense. *United States v. Hough,* 276 F.3d 884, 894 (6th Cir.), *cert. denied,* 535 U.S. 1089, 122 S.Ct. 1986, 152 L.Ed.2d 1042, *and* 537 U.S. 898, 123 S.Ct. 199, 154 L.Ed.2d 169 (2002). "A finding of fact will only be clearly erroneous when, although there may be some evidence to support the finding, 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Latouf,* 132 F.3d 320, 331 (6th Cir.1997), *cert. denied,* 523 U.S. 1086, 118 S.Ct. 1543, 140 L.Ed.2d 691, *and* 523 U.S. 1101, 118 S.Ct. 1572, 140 L.Ed.2d 805, *and* 524 U.S. 920, 118 S.Ct. 2307, 141 L.Ed.2d 165 (1998) (quoting *Anderson v. City of Bessemer,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). As long as the district court has interpreted the evidence in a manner consistent with the record, we are required to uphold its decision even if we would have reached the opposite conclusion. *Anderson,* 470 U.S. at 573–74. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574.

### B. Firearm Enhancement

U.S.S.G. § 2D1.1(b)(1) instructs sentencing courts to increase the defendant's sentence by two levels "[i]f a dangerous weapon (including a firearm) was possessed" during the manufacturing, importing, exporting, trafficking, or possession of illegal drugs or attempt or conspiracy of any of these offenses. U.S.S.G. § 2D1.1(b)(1) (2001). Under Application Note 3, the

guidelines state: "The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, cmt. n. 3.

The government has the initial burden of showing by a preponderance of the evidence that: "1) the defendant actually or constructively possessed the weapon, and 2) such possession was during the commission of the offense." *Hough*, 276 F.3d at 894. We previously have held that "[c]onstructive possession of an item is the ownership, or dominion or control over the item itself, or dominion over the premises where the item is located." *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir.), *cert. denied*, 519 U.S. 858, 117 S.Ct. 158, 136 L.Ed.2d 102 (1996) (citation and internal quotations omitted). Circumstantial evidence is permitted to establish constructive possession. *Miggins*, 302 F.3d at 391. Once the government meets this initial burden of showing that the defendant possessed a weapon during the offense, a presumption arises that "the weapon was connected to the offense." *Hough*, 276 F.3d at 894; *United States v. Bender*, 265 F.3d 464, 474 (6th Cir.2001); *see also United States v. Dunlap*, 209 F.3d 472, 477 (6th Cir.2000) ("[The defendant's] personal carriage of the altered rifle during his active commission of a drug trafficking offense raises the inescapable inference that he possessed the gun in connection with his concurrent narcotics transaction."). The burden then shifts to the defendant to "show that it was 'clearly improbable' that the weapon was connected with the crime." *Hough*, 276 F.3d at 894; *Bender*, 265 F.3d at 474. The § 2D1.1(b)(1) enhancement is "appropriate" if the defendant fails to meet this burden. *Miggins*, 302 F.3d at 391.

We previously have listed the factors that we consider when determining whether a firearm indeed is connected to a specific drug transaction: "the proximity of the firearm to the drugs, the type of firearm involved, whether the firearm was loaded, and any alternative purpose offered to explain the presence of the firearm." *United States v. Moses*, 289 F.3d 847, 850 (6th Cir.2002). For instance, we have upheld a sentence enhancement because the defendant had a gun during the active commission of a narcotics transaction, even though he purportedly planned on selling the gun to the confidential informant. *Dunlap*, 209 F.3d at 479. We allowed the sentence enhancement, noting that the defendant did not meet his burden of showing the clear improbability that the two offenses were connected. *Id.* (noting that "the weapon at issue was fully serviceable, was not an antique, and had been modified to facilitate its rapid deployment in a non-recreational confrontational context"). In upholding the defendant's sentence, we cited a First Circuit case for the proposition that the enhancement was proper "because the possibility existed that the defendant would have used the gun during the drug transaction had he thought it necessary." *Id.* (internal quotation omitted) (quoting *United States v. Castillo*, 979 F.2d 8, 9–11 (1st Cir.1992)).

With respect to conspiracies, "constructive possession is attributable to [the coconspirator]" as long as "it is reasonably foreseeable to a defendant that his coconspirator possesses a gun." *United States v. Williams*, 176 F.3d 301, 307 (6th Cir.1999). We use an objective test to determine whether a coconspirator's conduct is reasonably foreseeable. *United States v. Cochran*, 14 F.3d 1128, 1132 (6th Cir.1994). Defining this objective test, we previously have stated:

We are not willing to indulge the fiction that a firearm's presence always will be

foreseeable to persons participating in illegal drug transactions.... [W]e long have maintained that mere presence on the scene plus association with illegal possessors is not enough to establish constructive possession.... Rather, at a minimum, we require that there be objective evidence that the defendant knew the weapon was present, or at least knew that it was reasonably probable that his coconspirator would be armed.

*Id.* at 1133 (internal quotations and brackets omitted) (holding that the defendant's "ambivalent admissions" that he knew his coconspirator sometimes carried $1,000 when he bought drugs and that "big-time dealers ... probably try to do bodily harm" were insufficient to sustain the enhancement), *cf. Williams,* 176 F.3d at 308 (allowing the enhancement when defendant accepted as true a statement that the "firearm was present for the purpose of protecting the cocaine base that was seized").

■ The Defendants insist that it was "clearly improbable" that Stamper possessed the gun in connection with the drug transaction. First, they argue that Stamper was a gun enthusiast and always carried a gun with him. Next, they argue that Stamper possessed the gun for target shooting later that day. Defendants also note that because Stamper's gun did not have a cartridge in the chamber, as did the law enforcement officers' guns, Stamper's gun was not ready for immediate deployment and thus, was not intended to be used in connection with the drug transaction. Further, they note that Stamper neither displayed nor attempted to fire the weapon when the allegedly unidentified persons attempted to take down Webb. The Defendants remind us that the Supreme Court has cautioned lower courts to construe the guidelines strictly.

The Defendants cite *United States v. Zimmer,* 14 F.3d 286 (6th Cir.1994), a case

involving hunting rifles found at a home during a search, as support for their position. In that case, we reversed the district court's decision to apply the enhancement because the defendant had met his burden when he "show[ed] by unrefuted testimony that [the] rifles were for hunting and were unconnected with the marijuana." *Id.* at 290. We found it relevant that the defendant was charged with manufacturing rather than distribution, that there were no allegations that the defendant was selling the marijuana from his home such that he needed the guns to protect it, that two of the three guns were either unloaded or non-functioning, and that the guns were nowhere in the vicinity of the drugs. *Id.* at 291.

Stamper's argument that the weapon was for target shooting did not make it "clearly improbable" that the weapon was present to protect the drug transaction. Looking at the *Moses* factors in conjunction with the government's evidence, we believe that it is evident that the Defendants failed to meet their burden. The government's evidence showed that the weapon was in the waistband of Stamper's shorts as he sat in a car thirty-five yards away from the drug transaction, serving as a lookout. Testimony revealed that the specific firearm model was the standard issued firearm for the military. Although the firearm did not have a cartridge in its chamber, it had a fully loaded magazine of ammunition, and additional ammunition was found in the car. Moreover, the government produced Shults's statement which indicates that Stamper followed Shults and Webb in his white pickup truck with a gun in order to protect his interest in the drugs. *See Williams,* 176 F.3d at 308 (allowing the enhancement when defendant accepted as true a statement that the "firearm was present for the purpose of protecting the cocaine base that was seized"); *cf. United States v. Hernandez,*

187 F.3d 806, 809 (8th Cir.1999) (refusing to enhance the sentence when, among other things, the government produced no evidence to refute defendant's plausible assertions). Finally, the district court found Stamper's proffered alternative purpose not sufficiently credible, and this finding "is due considerable deference." *Moses*, 289 F.3d at 851 (citation omitted). As in *Moses*, Stamper's "self-serving testimony is inadequate to justify setting aside the district court's finding" that it was by no means clearly improbable that he possessed the gun in connection with the offense. *Id.* This is especially true when both the factual bases and Shults's signed statement indicate that Stamper was armed at the scene of the transaction to protect his interest in the drugs. Thus, we hold that the district court did not clearly err when it determined that the Defendants failed to meet their burden of showing that it was "clearly improbable" that the weapon was connected with the offense. J.A. at 101 (Dist.Ct.Or.).

This case also is distinguishable from *Zimmer* because in that case abundant evidence tended to show that the guns were used for hunting rather than the protection of drugs. *Zimmer*, 14 F.3d at 291 (noting that the defendant justified the presence of the only loaded rifle, found in the bathroom, by proving through a hunting citation that it was used the previous day to shoot a deer from the bathroom window). In contrast, here the gun was on Stamper's person as he served as a lookout during an active drug transaction. *See Dunlap*, 209 F.3d at 479. There was a distinct possibility that Stamper would have used the weapon if he had deemed it both prudent and necessary. *See id.* The fact that he chose not to use the weapon when marked officers appeared on the scene does not change the outcome. *See generally* U.S.S.G. § 2D1.1, cmt. n. 3 ("The enhancement for weapon possession reflects the increased danger of violence when drug traffickers *possess* weapons." (emphasis added)).

■ Shults and Webb also were properly held accountable for coconspirator constructive possession because Shults told law enforcement officials in a signed statement after his arrest that, while he and Webb were in the car en route to the drug transaction destination. Webb informed him that Stamper was following them to protect his interest and that Stamper was armed. Obviously. Stamper's gun was reasonably foreseeable to Webb and Shults when they both were aware of its presence even before arriving at the motel. This is all the objective evidence that we need to hold a coconspirator responsible for constructive possession because it shows that Stamper's gun was reasonably foreseeable to both Webb and Shults. *Cochran*, 14 F.3d at 1133 ("[W]e require that there be objective evidence that the defendant knew the weapon was present, or at least knew it was reasonably probable that his coconspirator would be armed."). Moreover, both Shults and Webb admit in their factual bases that they were aware that Stamper was in possession of a gun and that he was following them to the motel. Thus, we hold that there was sufficient objective evidence that Webb and Shults knew that the weapon was present, see *Cochran*, 14 F.3d at 1133, and hence the district court did not clearly err in subjecting Webb and Shults to the sentence enhancement based on a conspirator theory of constructive possession.

## C. Shults's Claims

### 1. Background Facts

Shults basically attempts to withdraw his guilty plea by raising the following issues in his pro se brief: (1) unknowing and involuntary plea; (2) entrapment; (3) mental capacity challenge to the "reasonably foreseeable" standard; (4) ineffective

assistance of trial counsel; and (5) ineffective assistance of appellate counsel due to a conflict of interest. Shults explains that for a period of months he worked as a confidential informant for the government. Employed in this fashion, he wore a wire on a number of occasions when he arranged drug deals with Webb. The essence of Shults's pro se appeal is that he was framed because he still was working in his informant capacity when he was arrested for the instant offense.

According to Shults, his involvement with the government began on March 22, 2001 when he appeared in court on felony child-support charges. At the courthouse, he was approached by Detective John Carroll ("Carroll") who said that he would be going to jail that day unless he cooperated and acted as an undercover informant. Once Shults reluctantly agreed, Carroll allegedly asked the judge not to incarcerate Shults because he was needed as an undercover drug informant. The judge agreed, as long as Shults immediately began making child-support payments.

The government put Shults to work in this new capacity right away. That same day, he met Carroll, Farrow, Special Agents Terry Wolf ("Wolf") and Mike Taylor ("Taylor"), and other law enforcement officials. The officers wanted Shults to wear a wire and "set up" Webb through a number of scheduled cocaine purchases. Shults contends that his participation was coerced because he was threatened with prison if he failed to participate. Shults admits that he participated as an undercover agent until about May 12, 2001, when he requested that he be excused as an informant because he feared for his safety if other members of the illegal-drug community found out that he was informing for the government.

A few days later, Farrow, Wolf, and Taylor set up a deal in which another informant contacted Shults to arrange a drug buy with Webb. Although Shults had recently expressed his desire no longer to participate as an informant, he believed that this deal was approved by the government and felt compelled to continue in his informant capacity. As evidence of this belief, Shults purportedly contacted Wolf by phone after speaking with the informant, and Wolf assured him to proceed as usual, as in previous undercover buys. In the meantime, Shults maintained regular contact with Wolf, even calling him with a status report on the morning of his arrest with Webb and Stamper. Later that day, Shults was arrested by the same law enforcement officials for whom he allegedly organized the transaction.

## 2. Unknowing and Involuntary Plea

Shults pleaded guilty to the drug conspiracy at issue and now attempts to show that he only pleaded guilty because his counsel instructed him to do so and that he was never part of the conspiracy but rather was hired and paid by the government to conduct regular buys from Webb. Once a sentence has been imposed, "the defendant may not withdraw a plea of guilty . . . and the plea may be set aside only on direct appeal or collateral attack." Fed. R.Crim.P. 11(e). "Accordingly, when the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary." *United States v. Broce*, 488 U.S. 563, 569, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989). If it is determined that it was both counseled and voluntary, then as a general rule, both the conviction and the plea will be upheld. *Id.* The exceptions to the general rule all occur when "on the face of the record the court had no power to enter the conviction or impose the sentence." *Id.*

Because a plea waives a number of significant constitutional rights, including the Fifth Amendment right against self-incrimination, the right to a trial by jury, and the right to cross examine one's accusers, it must be " 'an intentional relinquishment or abandonment of a known right or privilege.' " *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). In determining the standard for assessing whether a guilty plea is voluntary, the Supreme Court stated that the standard was identical to that for waiver of counsel because "a plea of guilty is more than an admission of conduct: it is a conviction. Ignorance, incomprehension. coercion, terror, inducements, subtle or blatant threats might be a perfect cover-up of unconstitutionality." *Boykin v. Alabama,* 395 U.S. 238, 242–43, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) (footnote omitted). "[M]isrepresentation or other impermissible conduct by state agents," makes a seemingly voluntary plea of guilty "vulnerable." *Brady v. United States,* 397 U.S. 742, 757, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). Additionally, because a guilty plea admits to all the elements of a crime "it cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts." *McCarthy,* 394 U.S. at 466. More specifically, "[a] plea may be involuntary either because the accused does not understand the nature of the constitutional protections that he is waiving or because he has such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt." *Ivy v. Caspari,* 173 F.3d 1136, 1141–42 (8th Cir.1999) (citing *Henderson v. Morgan,* 426 U.S. 637, 645 n. 13, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976)). Thus, a plea generally will be considered intelligent if it is done with an understanding of the rights that have been waived, whereas a plea is considered voluntary when it is free of inducements, misrepresentation, and threats and when the defendant is well aware of the direct consequences of the plea. *Brady,* 397 U.S. at 755–56.

In deciding whether a guilty plea is voluntary and intelligent we employ a totality of the circumstances approach. *Garcia v. Johnson,* 991 F.2d 324, 327 (6th Cir.1993). The government ordinarily meets its burden by producing the transcript from the court proceedings. *Id.* at 326. For the most part, a lower court's determination that the plea was proper will be sufficient for us to presume validity. *Id.* Conversely, when the transcript shows that the plea was not knowing and voluntary, this presumption is no longer reliable. *Id.* at 327. The voluntariness of a guilty plea is reviewed by this court de novo. *Avery v. United States,* 47 F.3d 1167, 1995 WL 6223 *2 (6th Cir. Jan. 5, 1995) (unpublished opinion).

▮ Shults contends that his plea was unknowing based on mental defect and involuntary because his lawyer coerced him to plead guilty, by misrepresenting to him that his claims of actual innocence would be handled later. At his plea hearing, the district court explained the rights that Shults was waiving and determined that not only was he competent to enter a plea, but also that he knowingly and voluntarily entered it. Shults agreed to a factual basis set forth in the plea agreement where he acknowledged his involvement in the conspiracy and admitted his guilt. Consequently, the record reveals that Shults knowingly and voluntarily pleaded guilty. *Garcia,* 991 F.2d at 327. This is not a situation where "on the face of the record the court had no power to enter the conviction or impose the sentence." *Broce,* 488 U.S. at 569.

Shults persists that the record is "silent" on the involuntariness of his plea due to

his lawyer's misrepresentation and subsequent concealment. However, even under de novo review, there is no evidence from which we can test the veracity of Shults's arguments. Therefore, on the record before us, we must conclude that the district court properly accepted the plea as voluntary and knowing. However, we note that Shults has adequately preserved the issue for collateral review. *Bousley v. United States,* 523 U.S. 614, 621, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) ("[T]he voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review.").

### 3. Entrapment

"A voluntary and unconditional guilty plea generally waives any non-jurisdictional claims that arose before the plea, including the defense of entrapment." *United States v. Cottage,* 307 F.3d 494, 499 (6th Cir.2002). Thus, because of our conclusion in the immediately preceding section. we must hold that Shults's entrapment claim is waived.

### 4. Mental Capacity Challenge to the "Reasonably Foreseeable" Standard

On its face, Shults's argument that he lacks the mental capacity to be held to the ordinary standard of reasonable foreseeability must fail. The "reasonably foreseeable" standard assists the sentencing court in making determinations as to whether coconspirators were more likely than not aware that their codefendant possessed a firearm. The entire purpose for this standard is to ensure that "there be objective evidence that the defendant knew the weapon was present, or at least knew that it was reasonably probable that his coconspirator would be armed," before a sentence enhancement is automatically applied. *Cochran,* 14 F.3d at 1133. However, when the defendant expressly admits in sworn statements that he had actual

knowledge that his coconspirator possessed a gun at the time of the illegal activity, any mental inability to understand the "reasonably foreseeable" standard would be irrelevant. Moreover, the test used to determine whether a coconspirator's conduct is reasonably foreseeable is an objective one. *See id.* at 1132. Shults's knowledge of Stamper's possession of a gun during the active commission of the drug felony meets that objective test.

### 5. Ineffective Assistance of Trial Counsel

In general, we do not allow a defendant to raise an ineffective assistance of counsel claim for the first time on direct appeal. *United States v. Smith,* 981 F.2d 887, 894 (6th Cir.1992). If, however, a sufficiently developed factual record exists from which to review the defendant's allegations, we will allow the claim to be brought on direct appeal. *United States v. Goodlett,* 3 F.3d 976, 980 (6th Cir.1993). Here, there are no facts from which we can assess the validity of Shults's claims because all we have are the allegations in Shults's pro se brief that his counsel persuaded him to plead guilty and that she assured him she would take care of his situation later. Shults's Pro Se Br. at 9 (paraphrasing Attorney Thomas as saying: "[f]or [Shults's] own good he should plead guilty and tell the judge that it was voluntary ... and then her people would take care of him"). Thus, it is apparent that the only way to raise this constitutional challenge would be for Shults to raise it in a collateral attack. *See United States v. Jackson,* 181 F.3d 740, 747 (6th Cir.1999) (noting that § 2255 should be used when the factual record is not developed); *see generally Massaro v. United States,* —— U.S. ——, 123 S.Ct. 1690, 1694, 155 L.Ed.2d 714 (2003) (holding that "an ineffective-assistance-of-counsel claim may be

brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal").

### 6. Ineffective Assistance of Appellate Counsel

Although it is not entirely clear, we believe that Shults attempts to raise on this direct appeal that his current counsel is ineffective because he has a conflict of interest. It appears that he bases this allegation on his appellate counsel's failure to argue the issues of actual innocence that Shults raises in his pro se briefs. For a number of reasons, this claim seems not only premature, raising ripeness concerns, but also seems "best brought in a post-conviction proceeding under 28 U.S.C. § 2255." *Jackson,* 181 F.3d at 747. Because claims of ineffective assistance of counsel, be it trial or appellate counsel, require fact finding with respect to whether the defendant was prejudiced, "appellate courts are not well-equipped to undertake the resolution of [these] factual issues." *Id.* Because we have no factual basis in the record for Shults's claims that he is actually innocent, we are unable to discern prejudice with respect to Shults's appellate counsel's failure to raise these claims. Thus, we "decline to address [Shults's] claim of ineffective assistance of [appellate] counsel so that the parties may develop an adequate record on the issue." *Id.*

### III. CONCLUSION

Based on the foregoing, we **AFFIRM** the district court's determination of the Defendants' sentences and Shults's conviction.