NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0403n.06

No. 08-3396

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Jul 08, 2010**
LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,  )
  )
    Plaintiff-Appellee,  )
  )
v.  )  On Appeal from the United States
  )  District Court for the Northern
JAMES HARRIS BEY, JR.,  )  District of Ohio
  )
    Defendant-Appellant.  )

Before:  MARTIN, BOGGS, and WHITE, Circuit Judges.

BOGGS, Circuit Judge.  James Harris Bey, Jr., was sentenced to 80 months of imprisonment for masterminding an elaborate check-counterfeiting scheme.  He now appeals his sentence, raising three arguments.  First, he asserts that, in determining his role in the scheme, the district court impermissibly relied on evidence adduced at the plea hearings of other defendants.  Second, he contends that the district court improperly enhanced his base offense level under USSG §2B1.1(b)(1)(H) because the government failed to prove that he had caused losses in excess of $400,000.  Third, he contends that the district court erred in imposing an enhancement under USSG §3B1.1(a) because there was insufficient evidence that he was an organizer or leader of a criminal activity involving five or more participants. For the following reasons, we affirm Bey's sentence.

I

On December 10, 2007, Bey pleaded guilty to one count of conspiring to pass counterfeit checks, in violation of 18 U.S.C. § 371, and four counts of passing counterfeit checks, in violation

of 18 U.S.C. § 513(a). He had previously pleaded not guilty but reversed course and entered into a Rule 11 plea agreement with the government.

In the agreement, Bey conceded his participation in a massive check-passing conspiracy that existed "from at least June 2000 to at least September 2, 2003." With respect to the workings of the conspiracy, the agreement provided, in relevant part, as follows:

> It was a part of the means and methods of the conspiracy that the conspirators would and did create counterfeit corporate checks purportedly drawn on accounts of banks and credit unions by means of a computer. These checks were computer signed. These counterfeited checks were counterfeited securities of the banks and credit unions on which they were purportedly drawn.

> It was further a part of the conspiracy that nearly all of the individuals participating in the conspiracy resided in the Detroit, Michigan, area. The conspirators would and did travel from Michigan to open checking accounts at banks or credit unions in various states in order to cash these worthless checks. These counterfeited checks were designed to appear to be company payroll checks of various types of companies selected by the conspirators which were drawn upon accounts at the banks and credit unions previously referenced.

> On various dates the check passers were transported to motels in the general vicinity of the banks or credit unions which had been targeted. The check passers were lodged in motels for approximately two or three days. On the first day, the check passers were transported to the appropriate state bureau or agency where they obtained State Identification Cards. The check passers had their hair styled and were dressed in clothing matching the persona of the type of employee they pretended to be, e.g., hardhats for construction workers, laboratory coats for lab workers, etc. Using State Identification Cards and small amounts of cash the check passers opened checking accounts in their names at the victim banks and credit unions. The check passers then deposited a counterfeit check into the checking account they had just opened in such a manner as to obtain a temporary credit on uncollected funds, thereby temporarily artificially inflating the balance of the checking account.

> Approximately one day later the check passers were transported to various branches of the victim organization where they presented and attempted to cash additional counterfeit payroll checks at each branch drawing funds from the artificially inflated balance of the victim organization's checking account. Since account activity is not reconciled between the various branches until the end of each business day, an artificially inflated balance could be cashed out as many times as the number of branches accessible to the conspirators in one

business day. Therefore, for an account with a balance of $1,200 and ten branches accessed in one day, the conspirators could withdraw $1,200 ten times for a total of $12,000. . . .

The activity attributable to James Harris Bey is that he conspired to produce counterfeit checks, recruit passers, rent vehicles, choose victims, arrange lodging and meals, provide cash to open checking accounts, dress the check passers, obtain new state identification cards for the check passers, create false company identification pins for the check passers, drive the check passers, and distribute illegal profits. James Harris Bey conspired to do the things referenced in the preceding sentence with Fred Lee Kendrick from October 2000-January 2003, Emon Weatherspoon from April 2003-July 2003, and with Ralph Starr, Jr., from June 2000-July 2000, and from December 2002-November 2003[.]

After delineating the factual basis of the plea, the agreement discussed a number of issues pertaining to the computation of Bey's advisory Sentencing Guidelines range. One such issue was the amount of loss resulting from Bey's criminal activities. Although the agreement stipulated that this figure did not exceed $950,000, the parties disagreed as to whether the losses attributable to Bey exceeded $400,000. If they did—which was the government's position—Bey's base offense level would be subject to a 14-level enhancement. *See* USSG §2B1.1(b)(1)(H) (instructing courts to increase the defendant's base offense level by "14 levels" if the offense resulted in losses of more than $400,000). If, however, they did not, a 12-level enhancement would apply. *See id.* at §2B1.1(b)(1)(G) (prescribing a 12-level increase for losses above $200,000). In light of this dispute, the parties agreed to let the district court determine the amount of loss from the check-passing scheme.

In addition to the amount of loss, the parties disagreed on the nature of Bey's role in the offense. The government argued that Bey was the leader of the check-passing conspiracy, a circumstance that would necessitate an additional 4-level enhancement. *See* USSG § 3B1.1(a) ("If the defendant was an organizer or leader of a criminal activity that involved five or more participants

or was otherwise extensive, increase by 4 levels."). Bey, however, denied that he was in charge. As a consequence, the plea agreement specified that Bey's role, like the losses he precipitated, would be determined by the district court.

Bey's sentencing hearing was held on March 11 and 14, 2008. At the hearing's conclusion, the district court adopted the government's assessment of the losses, finding them to be in excess of $400,000. The district court also sided with the government on the issue of Bey's role in the offense, holding that he was the leader of the check-counterfeiting enterprise. On the basis of these findings, the district court imposed a 14-level enhancement under §2B1.1(b)(1)(H) and a 4-level enhancement under §3B1.1(a). The resultant offense level was 23. Determining his criminal history score to fall within Category IV, the district court found Bey's advisory Guidelines range to be 70 to 87 months of imprisonment. Upon consideration of the 18 U.S.C. § 3553(a) factors, the district court sentenced him to a term of 80 months. It is from that sentence that he now appeals.

II

Under our holding in *United States v. Bostic*, if the district court fails to provide the parties with an opportunity to object following the pronouncement of the sentence, "they will not have forfeited their objections and thus will not be required to demonstrate plain error on appeal." 371 F.3d 865, 872 (6th Cir. 2004). "A district court can satisfy the requirements of the *Bostic* rule only by clearly asking for objections to the sentence that have not been previously raised . . . ." *United States v. Clark*, 469 F.3d 568, 570 (6th Cir. 2006). Simply asking whether there is anything further is insufficient. *See United States v. Thomas*, 498 F.3d 336, 340 (6th Cir. 2007) ("In this case, the district court asked Thomas's counsel, 'Do you have anything further for the record, Mr. Canady?'

No. 08-3396
United States v. James Harris Bey, Jr.

. . . We have previously determined that a similar question by the district court is not clear enough to satisfy the requirements of the *Bostic* rule." (citing *Clark*, 469 F.3d at 570)).

In this case, Bey failed to object to the district court's sentencing determination. However, after sentencing him, the district court asked merely whether he had "[a]nything more" to add. As a result, the district court did not properly pose the *Bostic* question, and the plain-error standard does not apply.

Instead,"we review [the] district court's sentencing determination, 'under a deferential abuse-of-discretion standard,' for reasonableness." *United States v. Lalonde*, 509 F.3d 750, 768 (6th Cir. 2007) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). In reviewing for reasonableness, we must, among other things, "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence . . . ." *Gall*, 552 U.S. at 51.

III

The first issue is whether the district court erred in relying on testimony adduced at the plea hearings of other defendants to determine Bey's role in the check-passing scheme. During Bey's sentencing hearing, the district court remarked that, in their pleas, "passer after passer after passer . . . identified Mr. Bey as the person who brought them into the crime and brought them into the conspiracy and who gave them the checks and the direction."[1] Bey now argues that the district

---

[1]This was not the district court's only reference to the plea-hearing testimony of other defendants. In announcing that it would impose a sentencing enhancement for Bey's leadership role

court's reliance on these identifications was improper because he lacked the opportunity to cross-examine the check passers who identified him. He also argues that, under *United States v. Christman*, 509 F.3d 299 (6th Cir. 2007), and *United States v. Patrick*, 988 F.2d 641 (6th Cir. 1993), the "statements by [his] alleged coconspirators were ex parte comunications upon which the [j]udge could not rely to resolve a contested factual dispute at sentencing." Appellant's Br. at 19.

Insofar as he argues that the district court's reliance on testimony adduced at separate proceedings was a violation of his rights under the Confrontation Clause, Bey is wrong. "[I]t is well established that neither the rules of evidence nor the right to confront witnesses applies at sentencing." *United States v. Christman*, 509 F.3d 299, 304 (6th Cir. 2007); *see also United States v. Hamad*, 495 F.3d 241, 246 (6th Cir. 2007) ("The right to confront adverse witnesses and to prohibit the introduction of testimonial hearsay without cross-examination does not apply at sentencing."). Indeed, "the district court may consider hearsay evidence in determining a sentence . . . [so long as the evidence] bear[s] some minimal indicia of reliability in respect of defendant's right to due process."[2] *United States v. Silverman*, 976 F.2d 1502, 1512 (6th Cir. 1992) (en banc).

---

in the check-passing scheme, the district court again noted that "person after person after person walk[ed] into this courtroom and testif[ied] under oath" that Bey had "recruited them to engage in check passing."

[2]Though Bey does not raise the issue on appeal, it is clear that the statements of the passers bore the necessary indications of trustworthiness. Significantly, the statements were made under oath, both at plea hearings and before a grand jury. As the Eleventh Circuit has remarked, "[t]he oath is an important indici[um] of reliability." *United States v. Trainor*, 376 F.3d 1325, 1332 (11th Cir. 2004). Additionally, the declarations—of which there were many—corroborated one another, further underscoring their reliability. *See United States v. Hunt*, 487 F.3d 347, 353 (6th Cir. 2007).

Bey is also mistaken if he cites *Christman* and *Patrick* for the principle that district courts are categorically forbidden from relying on evidence adduced at separate proceedings. In determining what sentence to impose, "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Tucker*, 404 U.S. 443, 446 (1972); *see also United States v. Zohfeld*, 595 F.3d 740, 744 (7th Cir. 2010) (noting that sentencing judges are under few constraints in terms of the information they may consider). In fact, Congress has explicitly provided that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence." 18 U.S.C. § 3661; *see also Christman*, 509 F.3d at 304 (noting that "Congress prefers the inclusion rather than the exclusion of information at sentencing"). Consequently, "[a] district court is indeed permitted to rely on testimony presented at a related proceeding . . . ." *Logan v. United States*, 208 F.3d 541, 544 (6th Cir. 2000); *see also United States v. Berzon*, 941 F.2d 8, 21 (1st Cir. 1991) ("We emphasize that we do not suggest that the district court was not entitled to hear the testimony at [codefendant's] sentencing, and, thereafter, consider it when sentencing defendant."); *United States v. Blackwell*, 49 F.3d 1232, 1236 (7th Cir. 1995) ("[M]ore than one circuit has condoned reliance on evidence from related trial proceedings of codefendants.").

But a district court's reliance on such evidence is improper if notice was not provided to the defendant in advance of sentencing. Federal Rule of Criminal Procedure 32(i)(1)(C) states that, "[a]t sentencing, the court . . . must allow the parties' attorneys to comment on the probation officer's

determinations and *other matters relating to an appropriate sentence*[.]" (emphasis added). In *Christman*, we explained that, when undisclosed evidence is factored into the sentencing calculus, the parties are denied their opportunity to address information germane to the district court's ultimate decision. *See* 509 F.3d at 304–09; *see also Patrick*, 988 F.2d at 649 (assessing whether a failure to disclose evidence deprived the defendant of "a sufficient opportunity to challenge [it]"); *United States v. Reynoso*, 254 F.3d 467, 473 (3d Cir. 2001) ("Were a court permitted to impose a sentence based in part on testimonial or other evidence from another proceeding not involving the defendant without giving the defendant and the Government advance notice, the defendant's right to comment meaningfully on all matters relevant to the sentence would be seriously compromised."). Like a number of our sister circuits, we have therefore read Rule 32(i)(1)(C) to require advance notice of any evidence to be relied upon at sentencing. *See Patrick*, 988 F.2d at 649 (suggesting that the district court erred in "fail[ing] to provide advance notice of its intention to rely on matters outside the record"); *see also United States v. Lovelace*, 565 F.3d 1080, 1092 (8th Cir. 2009) ("Both district courts erred by relying on information at sentencing that was not presented in advance to the defendant, in accordance with Rule 32."); *United States v. Warr*, 530 F.3d 1152, 1162–63 (9th Cir. 2008) ("Because the district court relied on this study, it should have notified Warr of it before the sentencing hearing.").

In this case, though the record is somewhat ambiguous as to the issue of notice, it appears that the district court failed to apprise Bey in advance of sentencing that it would be relying on statements made at the plea hearings of other defendants. If this omission occurred, the district court violated Rule 32(i)(1)(C)'s implicit disclosure requirement, an error that generally requires us to

vacate and remand. *See United States v. Gonzalez*, 529 F.3d 94, 97 (2d Cir. 2008) (declaring that "[r]esentencing is generally required if a court does not comply with the requirements of Rule 32" (quoting *United States v. Margiotti*, 85 F.3d 100, 103 (2d Cir. 1996)).

However, as we announced in *Patrick*, "improprieties on the part of sentencing judges are subject to review under the harmless error rule." 988 F.2d at 647–48. In determining whether a violation of the disclosure requirement is harmless, several factors are of special significance. First, the reviewing court may look to whether "other evidence already before the sentencing judge . . . fully supported the judge's ultimate finding . . . ." *Id.* at 648. Next, and more importantly, the reviewing court should consider whether "advance notice of the potential for reliance upon the evidence to which [the defendant] objects would . . . have provided [him] with any additional incentive or ability to challenge the accuracy of the evidence." *Ibid.* Also, the reviewing court may take into account any "failure [on the part of the defendant's counsel] to ask for a continuance to enable him to amass evidence to present in rebuttal . . . ." *Id.* at 649. And, finally, the reviewing court should check to ensure that, even though notice was not provided in advance of the sentencing hearing, the defendant "was at least so informed at the hearing . . . and was given an opportunity to address the evidence prior to the ruling on the issue." *Ibid.*

Applying these factors, we find that the district court's failure to provide advance notice was harmless. As pertains to the first factor, we note that the district court's determination regarding Bey's role in the offense was amply supported by other evidence. In addition to the passers' statements at their plea hearings—the evidence of which no advance notice was given—the district

court had before it the passers' statements to the FBI,[3] Bey's plea agreement, and the testimony of Ralph Starr,[4] one of Bey's right-hand men. In their FBI statements, which were introduced through the testimony of former FBI Special Agent Dean W. Winslow, many of the check passers indicated that Bey was "the individual who recruited them, who arranged the trips to pass counterfeit checks in . . . various states, provided them the ability to get state identifications, would provide them either through a driver of [sic] the checks or provide them directly from himself." Bey conceded as much in his plea agreement, another plainly appropriate source of evidence. On top of that, the district court had Starr's testimony, in which he unequivocally stated that Bey had spearheaded the check-passing operation. Starr testified that Bey created the counterfeit checks, handed them out, gave the instructions, and distributed the ill-gotten spoils. Thus, even if the passers' plea-hearing testimony had been subtracted from the sentencing equation, there would have been considerable evidentiary

---

[3]At sentencing, Bey objected to the introduction of these statements, presumably on the grounds that they were hearsay. However, he does not renew this argument on appeal, and it is therefore waived. *See Wilson v. Todd*, 53 F. App'x 744, 746 (6th Cir. 2002) ("The failure to present an argument in an appellate brief waives appellate review.").

[4]Bey argues that any reliance on Starr's testimony was error because Starr "had credibility issues." Appellant's Br. at 15. Under 18 U.S.C. § 3742(e), "[t]he court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses . . . ." *See also United States v. Hurst*, 228 F.3d 751, 761 (6th Cir. 2000) ("The sentencing court's credibility determinations, like other factual findings, must be accepted on review unless shown to be clearly erroneous."); *cf. United States v. Dunlap*, 209 F.3d 472, 476 n.8 (6th Cir. 2000) ("[A]ppellate courts generally do not review the district court's determinations regarding witness credibility."). Assuming, *arguendo*, that the district court's determination with respect to Starr's credibility is subject to appellate review, there is nothing in the record to suggest that it was clearly erroneous. Starr's statements were consistent with those of the check passers who identified Bey to the FBI, and they were also consistent with Bey's admissions that he produced counterfeit checks and routinely took passers on trips to cash them.

support for the district court's conclusion that Bey played a leadership role in the check-

counterfeiting scheme.

Moving to the second, and paramount, factor—whether advance notice would have provided

any additional incentive or ability to challenge the accuracy of the evidence—we find that it also cuts

against Bey. In *Patrick*, we noted:

> Where the evidence upon which the sentencing court relies without previously notifying the
> defendant is of the same character, allows the same inferences, and, most importantly, is
> subject to the same arguments in rebuttal as evidence in the record of which the defendant
> is already aware, it seems logical to conclude that advance notice would not give the
> defendant any additional incentive or ability to challenge the evidence.

988 F.2d at 648.

Here, each of the conditions is met. To wit, the plea-hearing testimony of the check passers

was of the same character as evidence in the record. Specifically, the undisclosed statements were

similar to the statements that the passers had given during their interviews with the FBI,[5] statements

of which Bey had admittedly known prior to his sentencing hearing.[6] In their interviews and at their

plea hearings, the passers identified Bey as the decision maker, indicating that he recruited them,

provided them with counterfeit checks, and gave them directions. The interview statements thus

---

[5]The record is devoid of any indication that the passers' interview statements differed materially from their plea-hearing testimony. In fact, the record indicates that they were substantially the same. When announcing Bey's sentence, the district court stated, "I also want to point out that many of those individuals who ID'd Mr. Bey, even if they're not every one of the check passers, they were all willing to testify under oath before the grand jury, and in most cases to swear under oath *to the same effect* before me at the time of their plea." (emphasis added).

[6]At oral argument, Bey's appellate counsel conceded that, prior to sentencing, the government provided Bey with copies of the passers' statements to the FBI.

allowed the same inference as the plea-hearing testimony, namely, that Bey led the conspiracy. "Under such circumstances, [Bey] already had an adequate incentive to present any evidence or arguments that he could that would contradict the inference that he was the leader." *Patrick*, 988 F.2d at 648. Moreover, the plea-hearing testimony of the passers was subject to the same arguments in rebuttal as their previous identifications. Any evidence tending to show that Bey was not the scheme's leader would be equally damaging to both sets of statements. Similarly, any attacks on the credibility of the passers, whether based on an incentive to lie, a history of prevarication, or plain ignorance, would undermine the probative weight of both the interview statements and the plea-hearing testimony.[7] Consequently, advance notice that the sentencing court intended to rely on the testimony of other defendants at their plea hearings would not have provided Bey with any additional motivation or capacity to challenge the evidence against him.

Looking to the penultimate factor—whether the defendant's counsel requested a continuance to accrue rebuttal evidence—it is evident that this consideration also weighs in favor of a finding of harmlessness. As we remarked in *Patrick*, "counsel's failure to ask for a continuance suggests that no rebuttal was possible[.]" *Id.* at 649 (discussing *United States v. DeBardeleben*, 740 F.2d 440, 447 (6th Cir. 1984)). Alternatively, such a failure might simply signal counsel's recognition that the

---

[7]The only argument to which the sworn testimony might be uniquely vulnerable is that the passers were induced to identify Bey under oath as part of a plea agreement. In response to this observation, however, it should be noted that the testimony of Ralph Starr, who reached a plea agreement in exchange for his testimony at Bey's sentencing hearing, was susceptible to this same line of attack. Indeed, Bey's counsel assailed Starr's testimony on these very grounds, stating: "[T]his man from the very beginning was motivated by this [fifteen-year] mandatory minimum sentence he was facing and, in fact, all of this thinking came to fruition because he got substantial time off . . . ." Therefore, even this argument is suggested by evidence already in the record.

previously undisclosed evidence was cumulative and therefore susceptible to arguments that had already been made. Whatever the precise cause, Bey's counsel declined to seek a continuance, strengthening the conclusion that advance notice of the check passers' plea-hearing testimony was immaterial.

Lastly, the fourth factor—whether the defendant was informed of the evidence at the hearing and permitted to challenge it prior to the court's ruling—also points toward the conclusion that any notice-related error was harmless. The passers' plea-hearing testimony was twice referenced during the course of Bey's sentencing proceeding, and the first such reference occurred prior to the district court's explanation of its sentencing decision. As a consequence, Bey was provided with an opportunity to contest the legitimacy and force of the evidence on which the sentencing decision hinged.

Accordingly, we conclude that any failure on the part of the district court to provide Bey with advance notice of its intention to rely on the statements of other defendants at their plea hearings was harmless error.

## IV

Bey's next argument is that the district court erred in imposing a 14-level enhancement under USSG §2B1.1(b)(1)(H) because the government failed to prove by a preponderance of the evidence that he had caused losses in excess of $400,000. For this argument to prevail, we must conclude that the district court's loss calculation—a figure placed at approximately $765,000—was clearly erroneous. *See United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006) ("Under the Guidelines, the district court is to determine the amount of loss by a preponderance of the evidence, and the

district court's findings are not to be overturned unless they are clearly erroneous."); *United States v. Guthrie*, 144 F.3d 1006, 1011 (6th Cir. 1998) ("The determination of the amount of loss is a finding of fact that we will not disturb unless clearly erroneous."). "A finding of fact will only be clearly erroneous when, although there may be some evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Darwich*, 337 F.3d 645, 664 (6th Cir. 2004) (quoting *United States v. Latouf*, 132 F.3d 320, 331 (6th Cir. 1997)). In applying this standard, "[w]e will uphold the district court's decision as long as it has interpreted the evidence in a manner consistent with the record." *Ibid.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985)). This means that, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Ibid.* (quoting *Anderson*, 470 U.S. at 574).

Review of the record in this case reveals that the loss calculation was not clearly erroneous. As an initial matter, we note that the district court's factual findings with respect to the issue of loss garner strong support from Bey's own admissions. During an interview with the FBI, Bey confessed that "he was once an aspiring rapper . . . [but] more or less gave up on his rapping career to commit check fraud."[8] Bey further estimated that, by devoting himself to the creation of fake checks, he was able to defraud banks of "at least $500,000." *Id.* at 2. This declaration alone provides ample basis for imposition of an enhancement under §2B1.1(b)(1)(H).

But there is more. The district court was also presented with the testimony of Special Agent

---

[8]Bey's nom de plume was "JMD," or "Just Makin' Dollas," a sadly appropriate moniker.

Winslow, who demonstrated that Bey could be linked to twelve hundred counterfeit checks. During his investigation of Bey's check-passing ring, Special Agent Winslow interviewed approximately sixty individuals, each of whom had passed some fraction of the checks in question. Of these sixty individuals, half identified Bey as the person for whom they were working. Agent Winslow then connected the spurious checks deposited by these thirty or so passers to the remaining checks through shared characteristics, which included common routing numbers, account numbers, and signatories. In all, the fraudulent checks tied to Bey were worth around $765,000, the figure at which the district court eventually placed the amount of loss.

However, as Bey notes, some evidence suggests that the district court's loss calculation may be inflated. In particular, Ralph Starr testified that, at the time of the conspiracy, several autonomous check-passing rings were contemporaneously operating in the Detroit area. According to Starr, each of these rings, including Bey's, was running the same scheme. Starr also indicated that the sundry check-passing rings all "got the game" from an individual named Chico.

Based on this evidence, Bey argues that the district court should have held him accountable only for checks that were passed by someone who explicitly identified him as the source. The logic of this argument is simple. Proceeding from the premise that Chico was the progenitor of the check-passing scheme, Bey contends that the check-passing rings must have generated checks with similar characteristics. Assuming this to be the case, the characteristics of the checks are incapable of inculpating any particular group; while such characteristics might narrow down the pool of potential sources, they do not single out a specific forger. If this reasoning is accepted and the checks to which Bey was circumstantially linked are removed from the loss calculation, the value of the

remaining checks (*i.e.*, those to which he was directly linked through passer identification) does not exceed $400,000.

Setting aside Bey's estimation that he was responsible for at least $500,000 in losses, his argument nonetheless fails. Bey points to no significant evidence in the record establishing that, because the check-passing groups got the game from Chico, they necessarily passed similar checks. The only indication that the various groups generated checks came from Bey's own mouth during an interview with the FBI, in which he stated that he had disseminated a disk containing data that would allow others to produce counterfeit checks.[9] As this statement is plainly self-serving and finds no additional support in the record, it lends no great quantum of legitimacy to Bey's position. The only person to whom the checks at issue have been in any way linked is Bey, and any speculation that other individuals may have produced similar checks is insufficient to engender a definite and firm conviction that a mistake was made.

In addition to raising the specter of independent check-passing rings, Bey observes that a number of the passers who identified him as the leader of the check-passing scheme initially implicated someone else. He argues that such inconsistencies indicate that the identifications should be disregarded. The fact remains, however, that all of those passers ultimately tapped Bey as the leader of the conspiracy. Though the evidentiary value of the identifications may be slightly

---

[9]Not so, says Bey. According to him, Starr's testimony indicated that the check-passing operations created similar checks. *See* Appellant's Br. at 14. But Starr merely stated that the groups "got the game from [Chico]." *Ibid.* He never explained whether this meant that Chico provided the groups with templates, routing numbers, and equipment, or whether it simply meant that Chico had taught them the scheme's basic idea.

diminished, there is nothing in the record to indicate that they are plainly incorrect, and the district

court's willingness to credit them was not clear error.

V

Bey's final argument is that the district court erred in enhancing his base offense level

pursuant to USSG §3B1.1(a) because the evidence failed to show that he was the leader of the check-

passing scheme. Under §3B1.1(a), a defendant's base offense level must be increased by four points

"[i]f [he] was an organizer or leader of a criminal activity that involved five or more participants."

For such an enhancement to be proper, "[t]he prosecution must prove a defendant's status (as an

organizer, leader, manager or supervisor) by a preponderance of the evidence." *United States v.*

*Gonzales*, 929 F.2d 213, 216 (6th Cir. 1991) (citing *United States v. Backas*, 901 F.2d 1528,

1529–30 (10th Cir. 1990)). In assessing a district court's decision that this burden has been met, "we

[have traditionally] reviewed the district court's factual findings for clear error and its legal

conclusions de novo."[10] *United States v. McDaniel*, 398 F.3d 540, 551 n.10 (6th Cir. 2005).

To determine whether a given defendant occupied an organizational or leadership role in a

criminal activity for purposes of §3B1.1(a), courts may consider several factors:

> [T]he exercise of decision making authority, the nature of participation in the commission
> of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits

---

[10]"The proper standard of review to employ in evaluating the district court's imposition of [a §3B1.1] enhancement is [actually] subject to some debate." *United States v. Henley*, 360 F.3d 509, 516 (6th Cir. 2004). However, the crux of the debate is whether to move from the traditional standard to a more deferential one. *See ibid.* (discussing "whether the district court's application of section 3B1.1 to the facts of [the] case should be reviewed deferentially or de novo"). Here, the district court's imposition of a §3B1.1(a) enhancement is proper under either standard, so we leave the resolution of this debate for another time.

of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

USSG §3B1.1, comment. (n.4). "There is no requirement . . . that each factor be met." *United States v. Ospina*, 18 F.3d 1332, 1337 (6th Cir. 1994); *see also United States v. Neal*, 187 F.3d 639, 1999 WL 551367, at *3 (6th Cir. 1999) (unpublished table decision) ("This circuit has remarked that the Sentencing Commission did not, via note 4, mandate a catalogue of required elements." (citation omitted)).

Upon scrutiny of the record, we decline to overrule the district court's determination that Bey was the leader of the check-counterfeiting ring. As the district court noted, dozens of check passers testified under oath that Bey "recruited them to engage in check passing." Additionally, Bey conceded that he produced the counterfeit checks, chose the routing numbers with which they were inscribed, and possessed the equipment with which they were fabricated. Bey also admitted that he regularly took passers on out-of-state check-passing trips, which Starr's testimony confirmed. What is more, Starr indicated in no uncertain terms that Bey "was running things." In Starr's words, Bey was "the type of guy who don't take no orders from nobody anyway." Nothing in the record indicates that this evidence should be disbelieved, and we are satisfied that, under the relevant factors, the district court did not err in finding that Bey played a leadership role in the offense. A 4-level enhancement under §3B1.1(a) was therefore appropriate.

## VI

For the foregoing reasons, we **AFFIRM** Bey's sentence.